OPINION OF THE COURT
Bernard J. Fried, J.
Before me is a motion to dismiss the second amended complaint pursuant to CPLR 3211 (a) (2) and (7). The second amended complaint, filed August 6, 2008, sets forth three counts: tortious interference with contract,[1] *3violation of the Donnelly Act (General Business Law § 340), and injunctive relief. For the reasons that follow, the motion is granted and the second amended complaint is dismissed with prejudice.
In reviewing a motion to dismiss under CPLR 3211 (a) (7), I must accept the pleading’s allegations as true. A more complete statement of the factual allegations underlying the Donnelly Act claim can be found in my July 3, 2008 decision deciding defendants’ motion to dismiss the first amended complaint. (Global Reins. Corp.-U.S. Branch v Equitas Ltd., 20 Misc 3d 1115[A], 2008 NY Slip Op 51362[U], *1-3 [Sup Ct, NY County, July 3, 2008] [July 3, 2008 decision].) Since those factual allegations are substantially preserved in the second amended complaint, I will not reiterate them.
The Donnelly Act prohibits any agreement or arrangement by which a monopoly is established or competition is restrained. (General Business Law § 340 [1].) To state a claim under the Donnelly Act, a plaintiff must: (1) identify the relevant product market; (2) describe the nature and effects of the purported conspiracy; (3) allege how the economic impact of that conspiracy is to restrain trade in the market in question; and (4) show that there is a conspiracy or reciprocal relationship between two or more entities. (Creative Trading Co. v Larkin-Pluznick-Larkin, Inc., 136 AD2d 461, 461-462 [1st Dept 1988].) In interpreting the Donnelly Act, New York courts generally follow federal case law analyzing the Sherman Act of 1890 (15 USC §§ 1-39; People v Rattenni, 81 NY2d 166, 171 [1993]).
“No heightened pleading requirements apply in antitrust cases. ‘[A] short plain statement of a claim for relief which gives *266 notice to the opposing party is all that is necessary.’ ” (Todd v Exxon Corp., 275 F3d 191, 198 [2d Cir 2001], quoting George C. Frey Ready-Mixed Concrete, Inc. v Pine Hill Concrete Mix Corp., 554 F2d 551, 554 [2d Cir 1977].) “Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.” (Todd, 275 F3d at 199-200.) Nevertheless, it is “improper ‘to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.’ ” (Id. at 198, 203 [plaintiffs allegation that the relevant market was the market for the services of certain professional and technical employees in the oil and petrochemical industry in the continental U.S. was plausible enough to survive motion to dismiss, based on allegation that those employees “accumulate industry-specific knowledge that renders them more valuable to employers in the oil and petrochemical industry than to employers in other industries”], quoting Associated Gen. Contractors of Cal., Inc. v Carpenters, 459 US 519, 526 [1983]; see also Theatre Party Assoc., Inc. v Shubert Org., Inc., 695 F Supp 150, 154-155 [SD NY 1988] [granting motion to dismiss plaintiff’s monopolization claim, which was based on an alleged market of advance sales of selected tickets to the early run of Phantom of the Opera, where plaintiff failed to explain why other Broadway shows or entertainment events were not adequate substitute products].)
Thus, to survive a motion to dismiss, it is sufficient for the complaint to allege “specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes.” (Todd, 275 F3d at 203.) While “market definition is most often a factual inquiry,” a motion to dismiss may be granted, however, “if the alleged market makes ‘no economic sense under any set of facts.’ ” (Pepsico, Inc. v Coca-Cola Co., 1998 WL 547088, *6, 1998 US Dist LEXIS 13440, *19 [SD NY, Aug. 27, 1998], quoting National Communications Assn., Inc. v American Tel. & Tel. Co., 808 F Supp 1131, 1134 [SD NY 1992].)
Defendants’ principal arguments on their motion to dismiss for failure to state a claim are that Global has failed to allege either a relevant product market or a restraint of trade in that market. I will first address the adequacy of the relevant product market allegations.
The second amended complaint, under the heading, “The Worldwide Market for Non-Life Retrocessional Reinsurance and *267 the Lloyd’s Submarket,” alleges that the relevant product market is the worldwide market for nonlife retrocessional coverage, i.e., the purchase, sale, and servicing of retrocessional coverage for risks written by reinsurers, with respect to property, casualty, and related lines of insurance business. (Complaint ¶ 28.)[2] The complaint also alleges that this market is recognized within the reinsurance industry as a distinct product market, as it involves specialized sellers and products, because its products are not interchangeable with other insurance products. (Complaint ¶¶ 29-30.) The complaint further alleges that the Lloyd’s marketplace is a distinct submarket of this market. (Complaint ¶ 34.)
As a preliminary matter: plaintiff has asserted in its opposition brief and at oral argument that the second amended complaint pleads in the alternative that Lloyd’s is a relevant product market in its own right. Plaintiff also argues that I am constrained by “law of the case” to uphold the adequacy of this alternative theory, because I sustained the adequacy of the product market allegations in the first amended complaint. I disagree with both contentions.
In my July 3, 2008 decision, I held that the first amended complaint had alleged a relevant product market with a geographic scope consisting only of Lloyd’s. (2008 NY Slip Op 51362[U], *13-14.) In deciding the motion to dismiss the first amended complaint, I was limited to the factual allegations in that complaint, which alleged a market for nonlife retrocessional reinsurance within Lloyd’s and nowhere alluded to a broader geographic market outside Lloyd’s. There were no factual allegations in the first amended complaint that suggested that any product market existed outside of Lloyd’s. Therefore, I refused to consider the parties’ arguments in their briefs and at oral argument that Lloyd’s was only a subset of a worldwide market.
Plaintiff sought permission, however, to move for leave to amend its first amended complaint to allege a broader geographic market. I granted its request. (2008 NY Slip Op 51362[U], *14.) Plaintiff so moved, leave was granted, and the second amended complaint is now before me.
An amended complaint supersedes the original pleading. (See Dragon Inv. Co. II LLC v Shanahan, 49 AD3d 403, 405 [1st Dept 2008] [original complaint was superseded by amended *268 complaint and was therefore no longer before the court]; Hayes v Utica Mut. Ins. Co., 16 AD2d 732, 732 [4th Dept 1962] [since amended complaint superseded and replaced original complaint, “the original complaint ... is not before us”].)[3]
It is clear that plaintiffs second amended complaint amends and replaces the first amended complaint. Not only is the second amended complaint styled as an “amended” complaint, but plaintiff was even careful to replead the tortious interference cause of action, which had been dismissed from the first amended complaint, in the expectation that the earlier complaint would not be considered in an appeal from the order of dismissal. (Second amended complaint ¶ 1 n.) Because the first amended complaint has been amended, it is no longer before me; it has been superseded and replaced with the second amended complaint. The second amended complaint must stand on its own.
The second amended complaint delineates precisely the scope of the alleged product market at issue in a new section, under the heading: “The Worldwide Market for Non-Life Retrocessional Reinsurance and the Lloyd’s Submarket.” (Complaint ¶¶ 28-36.) This section alleges that a worldwide market exists for the nonlife retrocessional reinsurance. There is not a single sentence or paragraph that alleges that the geographic scope of the relevant product market could be limited to Lloyd’s, or any allegation that the product in question is unique to Lloyd’s, or any hint of an alternative theory about the geographic scope of the relevant product market. The second amended complaint alleges only one product market — the Lloyd’s submarket of the worldwide market for nonlife retrocessional reinsurance. Indeed, at oral argument, plaintiffs counsel was unable to point to any sentence or phrase of the second amended complaint in which plaintiff had alleged an alternative product market. (Transcript at 34-35.)
Plaintiff argues, however, that the second amended complaint does not actually remove any of the allegations in the first amended complaint; it has simply supplemented them with additional paragraphs and a new heading. Even assuming this is true, the second amended complaint, read as a whole, casts the original paragraphs concerning the Lloyd’s market in an entirely new light — the light of the newly-alleged worldwide market for *269 nonlife retrocessional reinsurance. The relevant product market alleged in the second amended complaint is a different market from that alleged in the first amended complaint. Therefore, my conclusion in my July 3, 2008 decision, that a relevant product market had been alleged in the first amended complaint, does not bind my determination about whether a relevant product market has been stated in the second amended complaint.[4] Based on the specific product market allegations in the second amended complaint, I am obliged to determine whether plaintiff has alleged a restraint in a relevant product market under the Donnelly Act as a matter of law.
I turn to defendants’ contention that the complaint falls short of alleging that Lloyd’s is a true submarket of the worldwide market for nonlife retrocessional reinsurance. Because there is little Donnelly Act case law on this question, I will rely heavily on federal antitrust case law.
“[A] market is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level.” (AD/SAT, Div. of Skylight, Inc. v Associated Press, 181 F3d 216, 228 [2d Cir 1999] [internal quotation marks omitted].) “A relevant product market consists of ‘products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered.’ Products will be considered to be reasonably interchangeable if consumers treat them as ‘acceptable substitutes.’ ” (PepsiCo, Inc. v Coca-Cola Co., 315 F3d 101, 105 [2d Cir 2002] [citations omitted] [affirming grant of summary judgment dismissing Sherman Act claims because alleged market was not a true submarket], quoting United States v E. I. du Pont de Nemours & Co., 351 US 377, 404 [1956].)
“A market within a market, also termed a submarket, may also be the subject of a monopoly provided that its confines are well defined through the rule of reasonable interchangeability.” (Vitale v Marlborough Gallery, 1994 WL 654494, *3, 1994 US Dist LEXIS 9006, *11 [SD NY, July 5, 1994].) “The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the sub-market as a separate economic entity, the product’s peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and spe *270 cialized vendors.” (Brown Shoe Co. v United States, 370 US 294, 325 [1962], superseded by statute on other grounds as stated in Texas Instruments, Inc. v Hyundai Elecs. Indus., Co. Ltd., 49 F Supp 2d 893 [ED Tex 1999].)
The pleading requirements to allege a submarket are not different from those necessary to allege a product market. “[A] ‘submarket’ definition turns on the same inquiry as a ‘market’ definition — ‘whether the products in a proposed submarket are reasonably interchangeable in use or production with products in the broader market.’ ”[5] (Pepsico, 1998 WL 547088, **5, 1998 US Dist LEXIS 13440, *16; accord Frito-Lay, Inc. v Bachman Co., 659 F Supp 1129, 1137-1138 [SD NY 1986] [holding that corn chips did not constitute a submarket within the salted snack food market, because a corn chips consumer would be likely to substitute other salted snack foods, such as potato chips, if corn chips were unavailable].)
“In economists’ terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product.” (AD/SAT, 181 F3d at 227 [affirming dismissal on summary judgment of attempted monopolization claim, finding that defendant’s market share of under 20% was insufficient to support it, and rejecting proposed sub-market because it was characterized by low barriers to entry and rapid market development]; see also United States v Long Is. Jewish Med. Ctr, 983 F Supp 121, 137-140 [ED NY 1997] [rejecting plaintiffs characterization of two “anchor” hospitals as a submarket within relevant product market of general acute care inpatient hospitals, due to their prominent reputation, as unnecessarily restrictive, where such services were available elsewhere, other hospitals had good reputations, and data from injunction hearing showed consumers were willing to travel for treatment].)
Here, the complaint does not contend that nonlife retrocessional reinsurance policies sold at Lloyd’s differ from those *271 nonlife retrocessional reinsurance policies sold outside Lloyd’s. Plaintiff appears to concede that the actual product sold by Lloyd’s syndicates is not different from the product sold elsewhere in the worldwide market.
A product market, however, need not be defined by the uniqueness of the goods sold. It may also be defined by reference to a particular channel of distribution. “[I]t is appropriate to limit a market to a discrete channel of distribution so long as it is shown, using established market-definition criteria, that enough customers do not view other methods of distribution as viable substitutes to the distribution method in question.” (Pepsico, 1998 WL 547088, *8, 1998 US Dist LEXIS 13440, *25.)
For instance, in Pepsico, the plaintiff survived a motion to dismiss, because it had adequately alleged that Coca-Cola monopolized a distinct submarket for fountain-dispensed soft drinks distributed through food service distributors, within the broader market for fountain-dispensed soft drinks. The court found plausible its allegation that drinks dispensed through food service distributors were a distinct submarket within the market for all fountain-dispensed soft drinks, because “the complaint allege[d] that market realities force the end users in question to make their purchases exclusively through foodservice distributors.” (1998 WL 547088, *9, 1998 US Dist LEXIS 13440, *30.)
Similarly, the court in Federal Trade Commn. v Staples, Inc. (970 F Supp 1066 [D DC 1997]) concluded, after development of a factual record, that the sale of consumable office supplies through office supply superstores was a distinct submarket within the larger market of all superstores selling office supplies, based on data indicating that “office superstore prices are affected primarily by other office superstores and not by non-superstore competitors.” (Staples, 970 F Supp at 1077.) The data indicated that Staples’ prices were more than 5% higher in markets where it had no office superstore competition than in markets where it competed with the other office superstores.
In Staples, as in Pepsico, the noninterchangeability was based not on a difference between the products sold inside and outside the submarket — in both cases, the products were identical. Rather, the noninterchangeability came from the fact that “the character and value of the product actually manufactured by the parties . . . changes in the eyes of buyers by virtue of the manner in which it is delivered.” (Pepsico, 1998 WL 547088, *9, 1998 US Dist LEXIS 13440, *30-31 [“(b)ecause foodservice *272 distributors satisfy all of their customers’ supply needs at once, offering consolidated delivery and accounting systems, their customers buy supplies through them to the exclusion of all other methods of distribution”].)
Defendants’ counsel has taken the position that “what establishes that Lloyd’s is a submarket of the worldwide market is the distinctness” of Lloyd’s in the worldwide market as alleged in paragraph 36 of the complaint. (Transcript at 41; see also id. at 37-42.)
In paragraph 36, the complaint alleges four specific facts: (a) Lloyd’s is the “single most significant seller of most forms of non-life retrocessional coverage to reinsurers worldwide”; (b) Lloyd’s “provides the benchmark for prices, terms, and conditions for most forms of non-life retrocessional coverage”; (c) any prospective purchaser of retrocessional coverage “would have to at least consider approaching Lloyd’s for quotes and would have to take into account the terms and conditions offered by various Lloyd’s syndicates in determining what to purchase”; and (d) “competition within the Lloyd’s marketplace is more significant to prospective purchasers of retrocessional coverage than is competition between Lloyd’s as a whole and other sellers, because Lloyd’s is expected to, and does, set the lead in establishing coverage. ’ ’
In order to state a claim that Lloyd’s is a true submarket, the complaint must allege that the products sold at Lloyd’s are not interchangeable with other reinsurance products sold outside the Lloyd’s market. The allegations in paragraph 36, however, do not do that.
First, the allegation that Lloyd’s is the “single most significant seller of most forms of non-life retrocessional coverage to reinsurers worldwide” (complaint ¶ 36 [a]) does not describe a true submarket. The test of a relevant product market is whether the products are interchangeable outside the proposed market, not the seller’s “significance” in the world market, and this allegation does not indicate that the products at issue are not interchangeable with those sold outside Lloyd’s.
Similarly, the allegation that Lloyd’s “provides the benchmark for prices, terms, and conditions for most forms of non-life retrocessional coverage” (complaint ¶ 36 [b]) does not describe a true submarket. A “benchmark” is: (a) “a point of reference from which measurements may be made”; (b) “something that serves as a standard by which others may be measured or judged”; and (c) “a standardized problem or test that serves as *273 a basis for evaluation or comparison (as of computer system performance).” (Merriam-Webster OnLine Dictionary, at http:// www.merriam-webster.com/dictionary/benchmark [accessed Jan. 26, 2009].) In other words, a “benchmark” for prices is a standard or a point of reference by which other prices can be measured or evaluated. This allegation is quite different from alleging that economic realities compelled customers to shop at Lloyd’s, even if it charged higher prices or less favorable terms and conditions; therefore, this allegation falls short of describing a distinct submarket.
For the same reason, the allegation that any prospective purchaser of retrocessional coverage “would have to at least consider approaching Lloyd’s for quotes and would have to take into account the terms and conditions offered by various Lloyd’s syndicates in determining what to purchase” (complaint ¶ 36 [c]) falls short of plaintiffs pleading obligation. Even assuming it is true that prospective customers must “consider” asking Lloyd’s for quotes and take Lloyd’s quotes into account before purchasing coverage, this allegation falls short of alleging that market forces compel consumers to choose Lloyd’s, even if its quotes are not competitive in the worldwide market.
Finally, the allegation that “competition within the Lloyd’s marketplace is more significant to prospective purchasers of retrocessional coverage than is competition between Lloyd’s as a whole and other sellers, because Lloyd’s is expected to, and does, set the lead in establishing coverage” (complaint ¶ 36 [d]), too, is inadequate to state a claim. The complaint qualifies its statement that consumers find competition within Lloyd’s “significant” (whatever that means) by explaining the reason for Lloyd’s significance: “because Lloyd’s is expected to, and does, set the lead in establishing coverage.” Again, “setting the lead” in establishing the terms and prices of coverage is another way of saying that Lloyd’s sets the “benchmark” for prices and terms of coverage. It falls short of alleging that customers are somehow obliged by market forces to buy products through Lloyd’s, and that they will continue to buy products through Lloyd’s, even if its terms and prices are less favorable than those offered by sellers outside Lloyd’s. Plaintiff is asking me to expand the definition of a submarket well beyond that outlined persuasively in antitrust decisions such as Staples and Pepsico, and I see no good reason to do so.
While market definition is a fact-sensitive inquiry, I may not assume that plaintiff can prove facts that it has not alleged or *274 that defendants have violated the antitrust laws in ways that the complaint has not alleged. {Todd, 275 F3d at 198.) Even assuming all the product market allegations in the complaint are true, they are inadequate to state a claim under the Donnelly Act.
Defendants also contend that the complaint fails to allege a restraint of trade in the relevant market. This element requires an allegation of market power or genuine adverse effects on competition. (Capital Imaging Assoc., P.C. v Mohawk Val. Med. Assoc., Inc., 996 F2d 537, 546 [2d Cir 1993].) “Market power” is “the ability to raise price significantly above the competitive level without losing all of one’s business.” (CDC Tech., Inc. v IDEXX Labs., Inc., 186 F3d 74, 81 [2d Cir 1999] [internal quotation marks omitted] [Sherman Act claim].) Since I have already concluded that the complaint fails adequately to allege a relevant product market, I do not reach the question of whether the complaint alleges a restraint of trade by means of either market power or an adverse effect on consumers. The second cause of action is dismissed. The third cause of action for injunctive relief is consequently dismissed as well. I decline to permit plaintiff to amend its complaint for a third time.
Finally, at oral argument, I requested supplemental briefs on defendants’ novel argument, under CPLR 3211 (a) (2), that the Foreign Trade Antitrust Improvements Act of 1982 (15 USC § 6a) prohibits my exercise of jurisdiction over the Donnelly Act claim. In light of my conclusion that plaintiff failed to state a claim under the Donnelly Act, however, I do not reach this question. I regret that the parties were obliged to expend additional effort to brief this issue.
In accordance with this decision, it is ordered that the second amended complaint is dismissed with prejudice.

. Count I, alleging tortious interference, restates the tortious interference cause of action that I dismissed from the first amended complaint in my July 3, 2008 decision. This cause of action is dismissed from the second amended complaint for the same reasons stated in my July 3, 2008 decision.

. All complaint citations refer to the second amended complaint.

. In contrast, a “supplemental complaint [would] not supersede the original pleading.” (Stella v Stella, 92 AD2d 589, 589 [2d Dept 1983].)

. I will hereafter refer to the second amended complaint simply as the “complaint.”

. Consequently, some district courts in the Second Circuit have found the term “submarket” confusing and have preferred to speak only of relevant “markets.” (E.g. Pepsico, 1998 WL 547088, *5, 1998 US Dist LEXIS 13440,

16; AD/SAT, Div. of Skylight, Inc. v Associated Press, 920 F Supp 1287, 1296 n 6 [SD NY 1996], affd 181 F3d 216 [1999]; see also Geneva Pharms. Tech. Corp. v Barr Labs., Inc., 201 F Supp 2d 236, 267 n 15 [SD NY 2002], revd in part on other grounds 386 F3d 485 [2d Cir 2004].)