[921 NYS2d 1]

GLOBAL REINSURANCE CORPORATION-U.S. BRANCH, Formerly Known as GERLING GLOBAL REINSURANCE CORPORATION-U.S. BRANCH, Appellant, v EQUITAS LTD. et al., Respondents.

First Department, January 18, 2011

**APPEARANCES OF COUNSEL**

*Cahill Gordon & Reindel LLP*, New York City (*Edward P. Krugman* of counsel), for appellant.

*Simpson Thacher & Bartlett LLP*, New York City (*Kevin J. Arquit* of counsel), for respondents.

**OPINION OF THE COURT**

McGuire, J.

The complaint alleges that the Equitas defendants are the hub of a conspiracy that violates New York's antitrust law (General Business Law § 340 *et seq.* [the Donnelly Act]). The product market alleged is the market for non-life (property, casualty and related lines of insurance business) retrocessional reinsurance coverage—the coverage provided by retrocessionaires to retrocedents, i.e., the reinsurers that provide coverage to the insurers, or cedents, that provide the coverage to the underlying policyholders—and the market is alleged to include the purchase, sale and servicing of this retrocessional reinsurance coverage. The geographic scope of the market is alleged to be worldwide, but a submarket also is alleged, the Lloyd's marketplace, i.e., the collection in London of the hundreds of syndicates (composed of individual underwriting members or "Names") that annually compete for the placement of new insurance, reinsurance and retrocessional business. Prior to the formation of the conspiracy, syndicates that provide retrocessional coverage, like syndicates that provide the other forms of non-life insurance coverage, are alleged to have competed with each other in two principal areas: premiums charged and claims handling. With respect to claims handling, plaintiff essentially contends in the complaint, and in affidavits submitted in opposition to the motion to dismiss, that for decades the culture of the Lloyd's marketplace, a culture that helped it win business, has been that claims should be paid on terms that are favorable to claimants (be they policyholders, cedents or retrocedents), i.e., even when the policy's terms would permit the claims to be rejected. In other words, obtaining new business depends not only on having the ability to pay claims submitted on past contracts but on having a reputation for not making "hard-headed" decisions when those claims are submitted.

The alleged conspiracy originated in 1996, when the Names were faced with financial ruin because of potentially crippling losses stemming from unexpectedly large claims on certain pre-1993 non-life lines of business, i.e., long-tail asbestos and environmental coverage (the pre-1993 business). As the syndicates could not retroactively increase the premiums they received on the pre-1993 business, they could meet the threat only by cutting claims payouts. The problem with cutting claims

payouts, however, was that if only some syndicates sinned, all others would be saints. That is, individual syndicates of Names that cut claims payments would lose current and future business to syndicates that adhered to the culture that helped Lloyd's achieve its preeminent stature.

The solution was concerted action in 1996 that permitted all syndicates both to cut claims payments on the pre-1993 business and to compete as they historically had on new business. Through the Reconstruction and Renewal Plan (the R & R Plan), the Lloyd's marketplace was restructured. The Equitas entities were established, as the complaint alleges, "to reinsure and perform claims-handling responsibilities for certain pre-1993 liabilities of the Names, including liabilities under retrocessional agreements with retrocedents such as [plaintiff]." Pursuant to a Reinsurance and Run-Off Contract (the RROC) that the Equitas entities entered into with most of the Names, Equitas purportedly was granted "exclusive and irrevocable responsibility" for the liabilities of the Names that arose from the pre-1993 business. Thus, instead of the syndicates making their own independent decisions on the validity of claims and whether, when and how much to pay, under the RROC, those decisions were the sole province of Equitas. The reserves held by or on behalf of the Names to meet their individual liabilities under the pre-1993 business were pooled into a separate fund (the Fund) solely managed and controlled by Equitas. By reinsuring the liabilities of the Names under the pre-1993 business, each of the Names effectively capped its liabilities at the amount of the reserves contributed to the Fund (provided, presumably, that Equitas was able to pay all claims). The effect of the restructuring was to place all the syndicates simultaneously into runoff with respect to the pre-1993 business. Equitas's exclusive claims-handling authority permitted it to cut claims payouts on the pre-1993 business (and thus tended to ensure the adequacy of the reserves in the Fund).

In its main brief in this Court, plaintiff is understandably quick to point to the rationale for Equitas articulated by a Lloyd's executive in another litigation:

> " '[O]ne of the premises behind [Equitas] is that the efficient management of long tail liabilities is hindered, not helped, by the structure of Lloyd's. Internal competition provided by Lloyd's syndicate structure has helped the market win business over the years. But in handling long tail liabilities, the

decentralised syndicate system is flawed. Central-isation promises major savings' (*Allen v Lloyd's of London*, 1996 WL 490177, *52, 1996 US Dist LEXIS 12300, *159-160 [1996] [internal quotation marks omitted])."

Or, as the principal of the current owner of Equitas reportedly stated in explaining its multi-billion dollar investment in Equitas: "[B]y concentrating all of the liabilities into one place, [Equitas] had the advantage of eliminating much of the costly intramural squabbling that went on among syndicates." Also understandably, plaintiff states in its main brief that "[t]he correct name for such 'squabbling' is 'competition.' "

Although the complaint goes on to allege in considerable detail the ongoing consequences of the concentration in Equitas of claims-handling authority for the pre-1993 business, those consequences need not be detailed here. Suffice it to say, plaintiff alleges that cost savings from the elimination of claims service competition with respect to the pre-1993 business were realized over the ensuing years at its expense and that of retrocedents generally. According to plaintiff, Equitas engaged in claims payment behavior—i.e., denying claims and, when they were not denied, paying less and later—that retrocessionaires subject to competitive constraints could not have engaged in, and that it (plaintiff) has suffered millions of dollars in damages as a result.

In upholding the dismissal of the complaint, the dissent first accepts an argument—that plaintiff fails to allege an antitrust injury—rejected by Supreme Court when it denied Equitas's prior motion to dismiss under CPLR 3211 (a) (7) and (8) for failure to state a claim and want of personal jurisdiction. Legal analysis of that argument begins with the precept that the provisions of the Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result" (*Anheuser-Busch, Inc. v Abrams*, 71 NY2d 327, 335 [1988]). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful" (*Brunswick Corp. v Pueblo Bowl-O-Mat, Inc.*, 429 US 477, 489 [1977]). Antitrust laws "are meant to protect competition" and "[t]o demonstrate harm to competition, a plaintiff must show that there has been an adverse effect on prices, output, or quality of goods in the relevant market as a result of the challenged actions" (*Aventis Envtl. Science USA LP v Scotts Co.*,

383 F Supp 2d 488, 503 [SD NY 2005]). The antitrust plaintiff, accordingly, "must assert harm to competition as a whole" (*New York Medscan LLC v New York Univ. School of Medicine*, 430 F Supp 2d 140, 146 [SD NY 2006]). In determining whether a plaintiff has suffered antitrust injury, the conduct causing the injury is assumed to be a violation of the antitrust laws (*see* IIA Phillip E. Areeda et al., Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 335, at 74 [3d ed]; *see also SAS of Puerto Rico, Inc. v Puerto Rico Tel. Co.*, 48 F3d 39, 43 [1st Cir 1995]).

Immediately before stating its conclusion that plaintiff does not allege antitrust injury, the dissent writes that plaintiff "simply states a claim for breach of the relevant retrocessional treaties" when it alleges that its claims were settled on less favorable terms because of the concentration of claims-handling authority in Equitas. The dissent is wrong, however, if it means to suggest that plaintiff contends that it is entitled by contract law to all the favorable practices it and other retrocedents historically had enjoyed. Rather, plaintiff's position is that certain of the practices arose because of competition among the retrocessionaires, not because they are required by contract law, and that antitrust law bars the retrocessionaires from agreeing to stop engaging in any of the practices, not just those that are required by contract law. Moreover, even if plaintiff did contend that all the favorable practices were required by contract law, the dissent's implicit premise—that no antitrust violation could be stated—is wrong (*cf. Puerto Rico Tel.*, 48 F3d at 44 ["Not every antitrust claim in a contract case is simply a contract claim masquerading as a candidate for treble damages"]). Indeed, that premise entails the self-refuting proposition that conduct otherwise constituting a violation of federal and state antitrust laws is nonetheless not actionable if it constitutes a breach of contract under state law.

The other linchpin in the dissent's conclusion that plaintiff fails to allege antitrust injury is the undisputed fact that plaintiff itself has been in runoff and has not purchased retrocessional coverage since the alleged unlawful restraint of trade went into effect. Thus, the dissent cites *Puerto Rico Tel.* (*supra*) for the proposition that "the presumptively proper antitrust plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market" and stresses that plaintiff "does not allege that it participated in any market where retrocessional insurance

coverage was sold—either as purchaser or competitor—at any point after 1996 (when Equitas was formed), the period of the alleged conspiracy."[1]

Consistent with the appropriate methodology of assuming an antitrust violation, the dissent (and Equitas in its brief) all but expressly states that plaintiff would be a proper antitrust plaintiff if it had purchased retrocessional coverage after Equitas was formed and began exercising its exclusive claims-handling authority over pre-1993 business. But to hold that only then would plaintiff suffer antitrust injury would make no sense, because plaintiff would suffer no qualitatively different injury on account of that purchase; indeed, it would suffer no additional injury at all. No additional injury could be suffered precisely because the unlawful conspiracy does not—a condition of its success is that it must not—have any adverse consequences for purchasers of post-1993 non-life retrocessional coverage.

The dissent appears to be of the view that for a customer to be a proper antitrust plaintiff, the customer must be a purchaser after the unlawful agreement goes into effect. The dissent does not expressly adopt that view, however, and the parties do not discuss it. If that is the dissent's view, it cannot easily be reconciled with precedent holding that an antitrust plaintiff need not be a purchaser at all (*see e.g. New York Medscan*, 430 F Supp 2d at 148 ["there is no requirement that a plaintiff be a consumer or competitor to assert an antitrust claim"]). A customer who purchases after sellers enter into an illicit agreement to restrain trade and pays more for the product than it otherwise would is no doubt a paradigmatic antitrust plaintiff. But neither the dissent nor Equitas provides any reason grounded in the law or economics for concluding that only a customer injured by a purchase made after the illegal agreement takes effect suffers antitrust injury and is a proper antitrust plaintiff. Plaintiff alleges that through Equitas the Names "created a horizontal restraint—an agreement among competitors on the way in which they will compete with one another" (*National Collegiate Athletic Assn. v Board of Regents of*

---

1. Inexplicably, the dissent also states that plaintiff asserts that by concentrating claims-handling responsibility in Equitas, "competition in the [non-life retrocessional reinsurance] market [was affected] on a *prospective* basis" (emphasis added). In fact, however, plaintiff asserts that an essential attribute of the alleged scheme is that on a prospective basis the syndicates would compete in that market just as they historically had, freely and without restraint.

*Univ. of Okla.*, 468 US 85, 99 [1984]). A post-purchase horizontal restraint that deprives the purchaser of economic benefits it otherwise would obtain affects the quality of the product or service purchased, thereby causing economic injury just as real as a pre-purchase horizontal restraint that increases the price the customer pays. Just as obviously, sellers can obtain economic benefits from a horizontal restraint that are no less real when the restraint takes effect after rather than before purchases are made.

■ Plaintiff sustained antitrust injury because the quality of what it purchased, retrocessional coverage with the attendant claims-handling service, was adversely affected by an agreement eliminating competition over claims handling (*see Atlantic Richfield Co. v USA Petroleum Co.*, 495 US 328, 339 [1990] ["Antitrust injury does not arise . . . until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct" (emphasis omitted)]). We recognize that although such a pre-restraint purchaser will not invariably be injured—because, for example, a retrocedent like plaintiff will not necessarily have a claim that its retrocessionaire must handle—all post-restraint purchasers who pay a price inflated by a horizontal restraint necessarily are injured. But that hardly seems an adequate justification for concluding that no pre-restraint purchasers who are injured are proper antitrust plaintiffs, especially given that the horizontal restraint can be, as alleged here, one designed to impose costs directly on the purchasers so as to enable the sellers to avoid those costs.[2]

We turn to the ground on which Supreme Court granted the motion to dismiss the second amended complaint. In determining a prior motion to dismiss the first amended complaint, Supreme Court construed the complaint to allege only a market of limited geographic scope, a Lloyd's of London market. Supreme Court found that plaintiff's allegations were sufficient but also allowed plaintiff to move within a prescribed period for leave to amend the complaint to allege a worldwide market. On consent, plaintiff filed the second amended complaint, which in

---

**2.** Because plaintiff apparently has been in runoff at all relevant times since Equitas was established, its claims under pre-1993 business arguably would have been subjected to the same unfavorable treatment even if Equitas had not been established. Its retrocessionaires, after all, would not have been motivated by competitive considerations to accord it the favorable treatment they accorded to retrocedents who were or might be purchasing coverage on an ongoing basis. Equitas does not make this causality argument, however, and it could not in any event be resolved on the pleadings.

relevant part only added to the allegations of the first amended complaint by including allegations of a worldwide market for non-life retrocessional reinsurance and identifying the Lloyd's of London market as a submarket within that worldwide market. Equitas again moved to dismiss, challenging, inter alia, the sufficiency of the allegations of a worldwide market and a Lloyd's submarket. With respect to the challenge to the submarket allegations, Supreme Court rejected plaintiff's argument that the law of the case doctrine alone required that it be rejected. Supreme Court went on to rule that the second amended complaint failed sufficiently to allege a "true submarket" because it did not "allege that the products sold at Lloyd's are not interchangeable with other reinsurance products sold outside the Lloyd's market." (24 Misc 3d 264, 272 [2009].) Supreme Court dismissed the second amended complaint for this reason; despite expressly noting that plaintiff had alleged a worldwide market, Supreme Court did not mention or discuss the issue of whether the allegations of a worldwide market were sufficient. Although it was dismissing the antitrust allegations for the first time, and although it did not find that the specific deficiencies of the submarket allegations it relied upon were incurable, Supreme Court dismissed the complaint with prejudice. Moreover, it did so sua sponte.

On appeal, although plaintiff defends the sufficiency of the submarket allegations, its principal argument is that the second amended complaint pleads a worldwide market and that its express allegation that "the Lloyd's syndicates collectively had market power in the worldwide market for retrocessional coverage" was more than adequately supported by the specific allegations of paragraph 36. The second amended complaint unquestionably alleges a worldwide market and we agree with plaintiff that the allegations of market power are sufficient.[3]

---

**3.** As plaintiff also argues, market power need not be pleaded where actual adverse effects on competition are alleged (*see FTC v Indiana Federation of Dentists*, 476 US 447, 460-461 [1986] ["Since the purpose of . . . inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects" (internal quotation marks omitted)]). Accordingly, plaintiff also argues that a "naked agreement among the Names to coordinate claims handling of pre-1993 claims so as to reduce payment on those claims, followed by coordinated unreasonable claims handling[,] [is] subject to 'quick look' condemnation." Given the conclusion that the allegations of market power are sufficient, we need not address

In subparagraphs of paragraph 36 of the second amended complaint, plaintiff alleges that at all relevant times: the Lloyd's marketplace "was the single most significant seller of most forms of non-life retrocessional coverage to reinsurers world-wide"; the Lloyd's marketplace "provide[d] the benchmark for prices, terms, and conditions for most forms of non-life retrocessional coverage"; any reinsurer or broker seeking to purchase such coverage "would have to at least consider approaching Lloyd's for quotes and would have to take into account the terms and conditions offered by various Lloyd's syndicates"; and that "[f]or many lines of retrocessional business . . . competition *within* the Lloyd's marketplace is more significant to prospective purchasers of retrocessional coverage than is competition between Lloyd's as a whole and other sellers, because Lloyd's is expected to, and does, set the lead in establishing coverage."

Equitas's challenge to the sufficiency of these allegations of market power rests on a divide and conquer approach. That is, it analyzes each one separately and, after concluding, plausibly enough, that each is alone insufficient, it pronounces the whole insufficient. But the allegations must be viewed as a whole, and plaintiff is entitled to all reasonable inferences (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]). For these reasons, the allegations are sufficient because they support a reasonable inference that at all relevant times the Lloyd's syndicates had market power, i.e., "the ability to raise price significantly above the competitive level without losing all of [their] business" (*CDC Tech., Inc. v IDEXX Labs., Inc.*, 186 F3d 74, 81 [2d Cir 1999] [internal quotation marks and citation omitted]).[4] Moreover, any doubt on this score should be resolved so as to permit the

plaintiff's argument that it has adequately pleaded an unreasonable restraint of trade independent of the existence of market power. Nor need we address the dispute arising from that argument over whether "quick look" analysis is precluded by *Texaco Inc. v Dagher* (547 US 1 [2006]).

4. In the typical case, that is surely the appropriate definition of market power. As the unreasonable restraint alleged in this case has nothing to do with concerted action raising the price for purchasers, it is not obvious that whether an antitrust violation can be established should depend on whether the Names could do what they did not try to do, significantly raise the price above the competitive level without losing all their business. The parties appear to agree, however, that to the extent plaintiff relies on market power, it must show market power in this sense. Presumably, such a showing would tend to satisfy the requirement under the rule of reason test of "an actual adverse effect on competition as a whole in the relevant market" (*Capital Imaging Assoc., P.C. v Mohawk Val. Med. Assoc., Inc.*, 996 F2d 537, 543 [2d Cir 1993], *cert denied* 510 US 947 [1993] [emphasis omitted]). At one point in

fact-intensive question of market power to be resolved after discovery (*see Todd v Exxon Corp.*, 275 F3d 191, 199-200 [2d Cir 2001, Sotomayor, J.] ["Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market"]). Although Equitas protests that the allegations of paragraph 36 are conclusory, evidentiary detail is not required (*id.* at 198 ["No heightened pleading requirements apply in antitrust cases"]).

As plaintiff points out, Equitas's position that plaintiff cannot show market power is ironic. After all, Equitas offers, as it states, "a significant procompetitive justification for its formation—the preservation of competition that would have otherwise exited the market if Lloyd's had ceased to exist." But if Equitas is correct that the demise of Lloyd's would cause the worldwide market to suffer in a competitively significant way, it is in an awkward position when it nonetheless argues that an agreement among virtually all the Names to stop competing over claims handling does not cause worldwide competition to suffer in a competitively significant way.

Equitas offers three alternative grounds for affirmance, one the dissent does not discuss and the other two it accepts. We reject the first, that plaintiff's antitrust claims are barred by the Donnelly Act's four-year statute of limitations (General Business Law § 340 [5]), for essentially the reasons stated by Supreme Court in an order entered July 7, 2008 denying, inter alia, Equitas's motion to dismiss the first amended complaint.

The second argument is that New York courts lack subject matter jurisdiction over plaintiff's antitrust claims under the Foreign Trade Antitrust Improvements Act (FTAIA) (15 USC § 6a), as interpreted in *F. Hoffmann-La Roche Ltd v Empagran S. A.* (542 US 155 [2004]). In accepting that argument, the dissent concludes that plaintiff has not alleged that the anticompetitive conduct has had sufficiently direct effects on the domestic market. That conclusion is founded on a misreading of the complaint. According to the dissent, plaintiff "alleges that a conspiracy among the Lloyd's syndicates caused anticompetitive effects in a worldwide market—including, presumably, New

---

its brief, however, Equitas suggests that the appropriate market power showing in this case "would be the ability to drive down payments to reinsurers below the payments that would prevail in a competitive market" (internal quotation marks omitted). Of course, that is precisely what plaintiff alleges that Equitas was able to do with respect to pre-1993 business.

York—for the underwriting of *new* retrocessional reinsurance business because insurers worldwide follow a 'benchmark' set by Lloyd's" (emphasis added). Contrary to the dissent, plaintiff makes no claim at all that the anticompetitive conduct has had any effect on the pricing or any other aspect of competition over "new" retrocessional business, i.e., coverage provided in and after 1993. Rather, plaintiff complains about the effects on it and other retrocedents of the claims-handling conduct of Equitas relating to pre-1993 business.

■ Assuming the applicability of the FTAIA, the jurisdictional question is whether the challenged conduct has a "direct, substantial, and reasonably foreseeable effect" (*F. Hoffmann-La Roche*, 542 US at 159). Plaintiff's allegations of injury to it in New York are sufficient to support a reasonable inference of such effects. We do not doubt that under the federal statute that governs the determination of corporate citizenship for purposes of federal diversity jurisdiction (28 USC § 1332 [c]), plaintiff is a citizen of Germany. But as plaintiff argues, it is recognized by New York law to have legal status as a U.S. branch (*see* Insurance Law § 107 [a] [44] [" 'United States branch' means . . . the business unit through which business is transacted within the United States by an alien insurer"]), it is regulated by the New York State Insurance Department (Insurance Law § 1106 [e]), and it maintains separate financial statements (Insurance Law § 307 [a] [3]) which govern its capacity to take on risk without reference to the foreign insurer as a whole (Insurance Law § 1115 [a]; § 1313 [b] [1]). Relatedly, plaintiff alleges that the financial losses caused by Equitas's conduct are reflected on its distinct balance sheet as a branch. For purposes of determining whether the requisite anticompetitive effects occurred in New York, surely the legal status of plaintiff under New York law as a "branch" is at least relevant. Indeed, focusing on just one of the requirements of the Insurance Law applicable to United States branches of foreign insurers, the Third Department has stated that the "requirement places the branch in essentially the same position as if it were formally incorporated in this State" (*see Matter of Zurich Ins. Co. v New York State Tax Commn.*, 144 AD2d 202, 203 [1988], *lv denied* 74 NY2d 602 [1989]). We note, too, that the complaint alleges that Equitas engaged, and continues to engage, in anticompetitive claims handling in New York, and plaintiff asserts that it, qua branch, entered the insurance contracts and submitted the subject claims. Furthermore, in the procedural posture

of this case, dismissal of the complaint on this ground is particularly inappropriate (*see Todd v Exxon Corp.*, 275 F3d 191, 199-200 [2001], *supra*).

■ Finally, without citation to any authority, the dissent states that it "do[es] not believe that New York antitrust law should be applied extraterritorially to challenge the creation of a U.K. entity that has met with the approval of the U.K. insurance and antitrust authorities." In the first place, however, plaintiff challenges not the creation of Equitas but its post-creation conduct. That Her Majesty's government blessed the existence of Equitas does not license Equitas to violate New York laws with impunity. Moreover, as plaintiff stresses, comity is not an issue here because the anticompetitive conduct of Equitas was not mandated by British law (*see Hartford Fire Ins. Co. v California*, 509 US 764, 799 [1993] [rejecting comity argument of London reinsurers against application of Sherman Act; "the London reinsurers do not argue that British law *requires* them to act in some fashion prohibited by the law of the United States . . . or claim that their compliance with the laws of both countries is otherwise *impossible*" (emphasis added)]).

Accordingly, the judgment of the Supreme Court, New York County (Bernard J. Fried, J.), entered March 11, 2009, which dismissed the second amended complaint, should be reversed, on the law, with costs, and the complaint reinstated. Appeal from the order, same court and Justice, entered March 4, 2009, which granted defendants' motion to dismiss the second amended complaint, should be dismissed, without costs, as subsumed in the appeal from the judgment. Appeal from the order, same court and Justice, entered May 27, 2009, which denied plaintiff's motion for reargument, should be dismissed, without costs, as taken from a nonappealable order.

MANZANET-DANIELS, J. (dissenting). Because I believe that the New York antitrust statute, the Donnelly Act, may not be applied extraterritorially in the manner advocated by the majority, to govern the alleged anticompetitive practices of the London reinsurance market, a market that operates under the auspices of United Kingdom (U.K.) regulators, I respectfully dissent. The complaint herein fails to allege, nor does it purport to allege, a direct and substantial effect on the local domestic market, and the case involves fundamentally foreign commerce, as a result of which subject matter jurisdiction under the antitrust laws is lacking.

Plaintiff, Global Reinsurance Corporation, is not a domestic corporation but the United States branch of a German reinsur-

ance company. Like other reinsurance companies, Global further reinsured its obligations, as a "retrocedent," to other reinsurers, known as "retrocessionaires," under retrocessional agreements, further spreading the risk assumed by the cedents and reinsurers. One retrocessional reinsurance product, called non-life retrocessional reinsurance (NLRRI), pertaining to property and casualty insurance, is the product at issue in this case.

Global entered into certain retrocessional treaties with groups of underwriters, known as syndicates, in the London insurance market. Pursuant to these treaties, the syndicates agreed to pay a specified percentage of Global's risk under its various insurance obligations. In the late 1980s and 1990s, the individual underwriters, or "Names" as they are known in the London market, faced financial ruin after large losses outpaced the collection of premiums. The London market was restructured, pursuant to a Reconstruction and Renewal Plan (R&R Plan), to "fix and cap" the liabilities of the Names on pre-1993 business. The Equitas defendants were established, with the blessing of British insurance regulators, to reinsure and perform claims-handling responsibilities for certain pre-1993 liabilities of the Names, including liabilities under retrocessional agreements the Names had with retrocedents such as plaintiff Global. By agreement dated September 3, 1996, the Equitas defendants entered into a "Reinsurance and Run-Off Contract" with certain Names which granted Equitas exclusive and irrevocable responsibility for managing, evaluating and paying out on certain pre-1993 non-life liabilities of the Names.

Global contends, in the instant suit, that centralizing the Names' claims-handling obligations with respect to pre-1993 liabilities in a single entity, i.e., Equitas, provided Equitas with an anticompetitive advantage to renegotiate and/or discount the percentage liabilities owing to Global under the retrocessional treaties, in violation of the Donnelly Act (General Business Law § 340 *et seq.*). Global alleges, by way of example, that Equitas sought to impose "extra-contractual conditions" on Global's right to payment under the treaties by refusing to render payment of certain claims unless plaintiff furnished Equitas and the underwriters with releases of future liabilities, contrary to industry custom. Global alleges that the underwriters have refused to indemnify Global or delayed payment, or both, for certain asbestos-related claims under the treaties absent compliance with certain Reinsurance Documentation Requirements drafted and imposed by Equitas. Plaintiff alleges that Equitas's ability to engage in these practices

"stems directly from the combination effected by the R&R Plan, by which the previously independent Syndicates have been—illegally and in violation of the Donnelly Act—replaced by a single, combined entity that has no economic or business incentive to cause the Underwriters to honor their obligations under the Treaties."

Global asserts that the concentration of claims-handling responsibility in Equitas has affected competition in the NLRRI market on a prospective basis. However, plaintiff concedes that the current NLRRI product offered on the London market is interchangeable with other NLRRI products in the worldwide marketplace. In any event, plaintiff concedes that it no longer purchases the NLRRI product. Thus, the injury plaintiff Global sustained by virtue of any alleged anticompetitive conduct is confined to the effects of alleged concentrated claims-handling responsibility in Equitas by virtue of the restructuring of the London market pursuant to the 1996 Reinsurance and Run-Off Contract.

I do not doubt that plaintiff Global was "injured" in the sense that its claims were not settled on as favorable a basis as they had been previously, owing to consolidation of claims-handling responsibility in Equitas. However, this simply states a claim for breach of the relevant retrocessional treaties. Plaintiff fails to allege an antitrust injury as that term is understood (*see SAS of Puerto Rico, Inc. v Puerto Rico Tel. Co.*, 48 F3d 39 [1st Cir 1995] [the presumptively proper antitrust plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market]). Plaintiff does not allege that it participated in any market where retrocessional reinsurance coverage was sold—either as purchaser or competitor—at any point after 1996 (when Equitas was formed), the period of the alleged conspiracy.

More fundamentally, plaintiff Global fails to allege any facts that would permit a New York court to exercise subject matter jurisdiction over the alleged Donnelly Act violation. The Donnelly Act (General Business Law § 340 *et seq.*) proscribes monopolization and certain restraints of trade and applies to primarily intrastate conduct. The Donnelly Act is intended to apply to conduct "alleged to have a significant intrastate or local anticompetitive impact in violation of State antitrust law with *minimal interstate consequences*" (*Two Queens v Scoza*, 296 AD2d 302, 304 [2002] [emphasis added]; *H-Quotient, Inc. v Knight Trading Group, Inc.*, 2005 WL 323750, *4, 2005 US Dist

LEXIS 1924, *12-13 [SD NY 2005]; *see also People v Coventry First LLC*, 52 AD3d 345, 345 [2008] [Donnelly Act claim properly dismissed to the extent that defendants' alleged conduct did not take place "in this state"], *affd* 13 NY3d 108 [2009]). Nothing in the history of the Act or its application suggests that it was meant to have the extraterritorial effect urged by the majority.

Plaintiff alleges a "world-wide" conspiracy, not one directed at the U.S. market, let alone the local market. The majority would find the Act applicable to alleged anticompetitive conduct that occurred entirely abroad—i.e., the claims-handling practices of an entity created under the auspices of British insurance regulators—which happens to have an indirect effect on plaintiff Global, a branch office of a German reinsurance company. The majority cites no authority for the proposition that the Act was intended to have so broad a scope.

Furthermore, the majority's construction of the statute would give the state antitrust statute broader applicability than its federal counterpart, the Sherman Act, a result that cannot be reconciled with the Constitution. In order for an antitrust plaintiff to allege jurisdiction under the Sherman Act (upon which the Donnelly Act is based),[1] it must demonstrate that the alleged anticompetitive conduct (1) has a *direct, substantial and reasonably foreseeable* anticompetitive effect on United States commerce and (2) that such conduct gave rise to the antitrust claim. The anticompetitive conduct must be directed at the domestic market and not merely at a domestic plaintiff.

Plaintiff Global is "a branch of a foreign reinsurance company organized under the laws of Germany, with its principal place of business in Cologne, Germany." For purposes of subject matter jurisdiction, U.S. branches of foreign companies are deemed to be foreign entities (*see Colonia Ins., A.G. v D.B.G. Prop. Corp.*, 1992 WL 204376, 1992 US Dist LEXIS 12265 [SD NY 1992]). Lloyd's of London and Equitas are U.K. entities. The complaint alleges conduct involving a German entity and U.K. entities that occurred in the London marketplace and is regulated by the U.K. government. Thus, this case does not involve domestic commerce.

---

**1.** The Donnelly Act, or "Little Sherman Act," "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result" (*see Anheuser-Busch, Inc. v Abrams*, 71 NY2d 327, 335 [1988] [citations omitted]).

Whether or not Global is considered to be a U.S. entity, the complaint still fails to allege a sufficiently direct effect upon U.S. commerce giving rise to plaintiff's antitrust claim. Plaintiff Global alleges that a conspiracy among the Lloyd's syndicates caused anticompetitive effects in a worldwide market—including, presumably, New York—for the underwriting of new retrocessional reinsurance business because insurers worldwide follow a "benchmark" set by Lloyd's. However, such a roundabout, "but for" effect on the domestic market is insufficiently direct to confer subject matter jurisdiction under the federal statute. Where alleged anticompetitive effects in the U.S. are based on a theory that the globally interconnected nature of the marketplace enabled foreign conduct to affect the U.S. market, that effect is not considered "direct" within the meaning of the federal statute (*see Boyd v AWB Ltd.*, 544 F Supp 2d 236, 246 [SD NY 2008] ["although plaintiffs (U.S. wheat farmers) may have alleged a plausible theory of causation based on the global interrelatedness of the wheat markets in Iraq and the United State, (defendant's) extraterritorial conduct in Iraq was, at most, only a 'but for' cause of the alleged drop in wheat prices in the United States"]; *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F Supp 2d 555, 561 [D Del 2006] [dismissing suit by U.S. computer chip microprocessor against U.S. competitor which manufactured components and assembled them into final products abroad; "While the Court understands the nature of a global market, the allegations of foreign conduct here result in nothing more than what courts have termed a 'ripple effect' on the United States domestic market, and (federal law) prevents the Sherman Act from reaching such 'ripple effects' "]).[2]

Plaintiff procured retrocessional reinsurance from the London market. Plaintiff alleges that the centralization of claims-

---

2. The allegations found wanting in these cases are virtually indistinguishable from the allegations in the amended complaint. For example, in *Intel*, the plaintiff alleged that

> "[i]n maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel must necessarily exclude them from the product market worldwide. As the domestic U.S. market is but an integral part of the world market, successful monopolization of the U.S. market is dependent on world market exclusion, lest foreign sales vitalize a rival's U.S. competitive potential." (452 F Supp 2d at 560.)

The court rejected these allegations, reasoning "[plaintiff] places great weight on its allegations that it is an American company engaged in a world-wide market; however, such allegations do not create jurisdiction without substantial, direct effects on the domestic market." (*Id.* at 561.)

handling responsibility in Equitas, an entity created under the auspices of British insurance regulators, has resulted in unfavorable and alleged anticompetitive settlement of claims under its treaties of retrocessional reinsurance. Global alleges that but for Lloyd's conduct in the United Kingdom, other market players, presumably including domestic market players, would offer retrocessional reinsurance at more competitive prices, terms and conditions. The alleged anticompetitive conduct is "in significant part foreign," and rests on a foreign harm, even assuming, arguendo, that it has caused some attenuated domestic injury (see *F. Hoffmann-La Roche Ltd v Empagran S. A.*, 542 US 155, 158 [2004]).

Further, I do not believe that New York antitrust law should be applied extraterritorially to challenge the creation of a U.K. entity that has met with the approval of the U.K. insurance and antitrust authorities. The R&R Plan by which Equitas was formed was cleared through the relevant British insurance regulatory authorities at the Department of Trade and Industry. The R&R Plan was also reported to the relevant antitrust regulators in the United Kingdom and Europe, including the U.K. Office of Fair Trading and the European Commission. Indeed, the R&R Plan was even evaluated by the New York Insurance Department. For all of the foregoing reasons, the second amended complaint was properly dismissed.

FRIEDMAN, J.P., RENWICK and RICHTER, JJ., concur with McGUIRE, J.; MANZANET-DANIELS, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, entered March 11, 2009, reversed, on the law, with costs, and the complaint reinstated. Appeal from order, same court, entered March 4, 2009, dismissed, without costs, as subsumed in the appeal from the judgment. Appeal from order, same court, entered May 27, 2009, dismissed, without costs, as taken from a nonappealable order.

The decision and order of this Court entered herein on January 11, 2011 is hereby recalled and vacated.