**CDC TECHNOLOGIES, INC., a Connecticut corporation, Plaintiff–Appellant,**

v.

**IDEXX LABORATORIES, INC., a Delaware corporation, Defendant–Appellee.**

**No. 967, Docket 98–7626.**

United States Court of Appeals, Second Circuit.

Argued: April 14, 1999

Decided: July 21, 1999

Michael R. Borasky, Fort Lauderdale, FL (Joseph M. Ramirez, Heather E. Rennie, Pittsburgh, PA, Robert A. Sherman, Boston, MA, Eckert Seamans Cherin & Mellott, LLC; Edward R. Scofield, Zeldes, Needle & Cooper, Bridgeport, CT, on the brief) for Plaintiff–Appellant.

David H. Erichsen, Boston, MA (James C. Burling, Vinita Chopra, Hale and Dorr LLP, on the brief), for Defendant–Appellee.

Before: VAN GRAAFEILAND, JACOBS, and STRAUB, Circuit Judges.

JACOBS, Circuit Judge:

In this antitrust case, plaintiff-appellant CDC Technologies, Inc. ("CDC"), which sells blood analysis machines to veterinarians, alleged that its competitor, defendant-appellee IDEXX Laboratories, Inc. ("IDEXX"), illegally entered into exclusive dealing arrangements with CDC's distributors. The distributors had provided CDC with the names of veterinarians potentially interested in purchasing the product. IDEXX, a later entrant in the market (though the leading player in the market for in-clinic veterinary diagnostic equipment generally) signed up CDC's distributors to play the same role in furnishing the names of likely veterinarians. This is an appeal from a judgment of the United States District Court for the District of Connecticut (Arterton, *J.*) granting summary judgment to IDEXX, and dismissing the complaint. *See CDC Technologies, Inc. v. IDEXX Laboratories, Inc.*, 7 F.Supp.2d 119 (D.Conn.1998).

CDC asserted claims under the Clayton Act and the Sherman Act, with corresponding and derivative state law claims. In dismissing, the district court concluded that CDC could not prove that the exclusive dealing arrangements had anti-competitive effects because: (i) the role of the distributors was so limited; (ii) CDC had successfully used other techniques to reach end-users; and (iii) the exclusive dealing arrangements were of short duration and easily terminable. *See id.* at 121–22.

As to the claim asserted under § 3 of the Clayton Act, 15 U.S.C. § 14 (1994), we affirm on the threshold ground that the

Act does not regulate an arrangement with a distributor or middleman unless it involves actual sales, and it is undisputed here that IDEXX's distributors never purchased the machines or resold them.

As to CDC's claim under § 1 of the Sherman Act, 15 U.S.C. § 1 (1994), we affirm on the ground that CDC failed to demonstrate that there is a triable issue on the anti-competitive effects of the exclusive dealing arrangements.

As to CDC's remaining federal and state claims, we affirm for substantially the reasons stated by the district court.

## BACKGROUND

CDC, a Connecticut-based start-up company, manufactures and sells machines that allow veterinarians to analyze animal blood. IDEXX, a firm based in Maine that sells a wide array of products to veterinarians, sells a competing machine.

CDC entered this market first, and sold its hematology machines both through direct marketing and through relationships it established in 1992 and 1993 with four veterinary product distributors. The distributors did not actually sell the machine; in fact, their sales representatives did not even demonstrate it for prospective customers. Their role was limited to providing "qualified leads"—meaning that they passed along to CDC the names of veterinarians who had expressed an interest in the product, and received in exchange from CDC a finder's fee if the lead produced a sale.

In addition CDC employed its own direct sales force to market its product (a method that was more profitable than selling with the assistance of the distributors), as well as "telemarketing, direct mail campaigns, customer lists, advertising, and participation in trade shows." *CDC Technologies,* 7 F.Supp.2d at 123. By late 1993, half of CDC's equipment sales were catalyzed by distributors.

IDEXX began selling animal-blood analysis machines in 1993, when IDEXX agreed with an existing manufacturer, Becton Dickinson, to use IDEXX's sales and distribution network to resell Becton Dickinson's "Autoread" model. In internal memoranda, IDEXX employees gloated about competitors' having "poor distribution" and about IDEXX's plans to "[b]lock [competitors' products] at [the][d]istribution [c]hannel[s]." Other documents referenced plans to "[e]rect [b]arriers to [e]ntry" and to "[c]reate an [e]nvironment [h]ostile to [c]ompetitive [e]ntry."

IDEXX had a longstanding unwritten exclusive dealing policy that no IDEXX distributor could market a competing product. When IDEXX began selling Autoread in 1994, the distributors that had been providing qualified leads to CDC ended their relationship with that firm and instead opted to market the Autoread for IDEXX. Their arrangement with IDEXX was the same as their arrangement with CDC: they did not buy the Autoread machine, or sell it; they only provided "qualified leads" to IDEXX. Also in 1994, IDEXX put its exclusive dealing policy in writing. It covered all IDEXX products, including Autoread; its term was one year; but a distributor could pull out of the agreement on 60 days notice, with or without cause. At the time discovery closed in September 1996, IDEXX had approximately half of the "distributor market" sewn up with such agreements.

After some interval, CDC sought out new distributors. By November 1995, it had signed up distributors covering most of the country; by April 1996, CDC's machine was sold through eight (non-IDEXX) distributors. At the same time, CDC greatly increased its direct sales force and its spending on other marketing mechanisms. During the relevant time period, CDC's sales through "third-parties" (including distributors) stayed nearly level (55 machines in 1992–93; 56 in 1994–95), while its direct sales increased dramatically (52 to 402, same years).

Nonetheless, CDC remained a minor player in the market. IDEXX, on the other hand, had achieved an 80 percent market share by the time discovery closed in this case (September 1996)—approximately a 50 percent increase over the market share of Becton Dickinson at the time IDEXX began reselling Autoread.

Since IDEXX's entry into the market, another company, ZynoCyte, has introduced a machine in competition with those sold by IDEXX and CDC. It has nationwide distribution.

## A. Procedural History

In February 1995, CDC sued IDEXX alleging: (i) unlawful exclusive dealing in violation of the Clayton Act and Connecticut statutes; (ii) unlawful restraint of trade under both federal and state antitrust statutes; (iii) monopolization, conspiracy to monopolize, and attempt to monopolize under the Sherman Act and state statutes; (iv) unfair trade practices in violation of state law; (v) civil conspiracy; and (vi) tortious interference with business relations.

IDEXX moved for summary judgment, and on March 2, 1998, Magistrate Judge Garfinkel recommended that the motion be granted. The magistrate judge first concluded that there was a genuine issue of material fact as to the "relevant market": IDEXX defined it broadly to include all chemical and hematological methods for analyzing blood; CDC defined it narrowly as "in-clinic hematology analyzers for use by veterinarians." See id. at 126. The magistrate judge next assumed for the purposes of the summary judgment motion that the relevant area of competition was the United States (as CDC contended), not (as IDEXX contended) the world. See id. at 127.

The magistrate judge concluded that, even if both those issues were decided in CDC's favor, CDC failed to raise a genuine issue of material fact as to whether "IDEXX's exclusive dealing contract foreclosed a substantial share of the ... market." Id. at 128 (citing Tampa Electric v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961)). The market foreclosure analysis required consideration of "the percentage of the market foreclosed, the duration of the exclusive arrangement, the 'notice of termination' period, and the competitive effect of the exclusive dealing contract in the relevant market." Id. (citation omitted). The magistrate judge concluded that there was only "scant evidence" that IDEXX's exclusive arrangements with distributors hindered CDC's "ability to reach the ultimate customers" of its machine:

- CDC's distributors had played a quite "limited role" (even before IDEXX's entry into the market), providing qualified leads, but not selling the machine or even demonstrating it.

- CDC had successfully utilized other avenues to reach customers, and its sales *increased* after IDEXX entered the market.

- Despite IDEXX's exclusive dealing agreements with its distributors, CDC had been able to sign up eight new distributors, and thereby achieve coverage throughout most of the country.

- The one-year term of IDEXX's exclusive dealing agreements, and their 60–day termination provision, meant that any distributor that preferred to market CDC's product could do so with relative ease.[1]

---

1. The exclusivity was product-limited, meaning that a distributor could agree to sell a competitor's product in one product line while promoting IDEXX product in other lines. According to CDC, distributors feared that IDEXX would retaliate against a CDC distributor by withholding a broad range of other products; but the magistrate judge found "no admissible evidence in the record which would support such a proposition." CDC Technologies, 7 F.Supp.2d at 129.

- Since IDEXX's 1994 market entry, a third company, ZynoCyte had begun selling a competing machine and had established nationwide distribution.

*See id.* at 128–30.

The magistrate judge decided that CDC's inability to establish the required elements of the Clayton Act claim defeated a fortiori the more demanding claims under the Sherman Act, and that in any event, those Sherman Act claims were fatally defective. *See id.* at 130–31. The state civil conspiracy claim failed because it required the establishment of a separate cause of action, and CDC had none. Finally, the magistrate judge summarily rejected CDC's claims for tortious interference and unfair competition. *See id.* at 131–32.

Judge Arterton adopted the magistrate judge's recommendation in all respects. *See id.* at 120–22.

## DISCUSSION

### A. Clayton Act Claim

We affirm the district court's dismissal of CDC's Clayton Act claim, but do so on a threshold question.

Section 3 of the Clayton Act reads (in relevant part):

It shall be unlawful for any person . . . to . . . *make a sale or contract for sale* of goods . . . on the condition, agreement, or understanding that the . . . *purchaser* thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . *seller,* where the effect of such . . . sale, or contract for sale or such condition, agreement, or

understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14 (emphasis added).

■■■■ Section 3 thus prohibits only (specified) "sale[s]" or "contract[s] for sale." [2] A cognizable transaction is therefore one with both a "seller" and a "purchaser." CDC's Clayton Act claim, based as it is on the exclusive dealing relationship between IDEXX and its distributors, fails because these distributors are not "purchasers." *Cf. McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332, 337 (4th Cir.1959) ("[W]hile Congress was aware of other business practices which might also be harmful to the economy, it was attempting to outlaw only those with which the section expressly dealt.") The IDEXX distributors do no more than provide "qualified leads"; they do not buy the hematology machines from IDEXX; and they do not sell them to customers.[3]

The Supreme Court's last word on this subject is that § 3 by its terms requires a "sale." *See Federal Trade Comm'n v. Curtis Publ'g Co.,* 260 U.S. 568, 581, 43 S.Ct. 210, 213, 67 L.Ed. 408 (1923). In *Curtis,* a publisher barred its dealers and distributors from dealing in its competitors' magazines. *See id.* at 574, 43 S.Ct. at 211. The critical feature of the arrangement was that the publisher "consign[ed]" magazines to each agent, retaining title until sale. *Id.* at 576, 43 S.Ct. at 212. Section 3 was not violated because the contracts thus were "one[s] of agency, not of sale upon condition, and the record reveals no surrounding circumstances suffi-

---

**2.** *In a portion of the statute not excerpted here, it also proscribes certain leases. See* 15 U.S.C. § 14.

**3.** The distributors do resell IDEXX "consumables," which are the chemical reagents used with each test and proprietary to a given machine. But CDC is not basing its exclusive dealing claim on the sale of these consumables. *See CDC Technologies,* 7 F.Supp.2d at 126 ("CDC claims that the product-market

definition should be comprised *solely of in-clinic hematology analyzers* for use by veterinarians." (emphasis added)). In any event, CDC concedes that the market for consumables is completely derivative of the analyzer market, *see* Brief for Plaintiff–Appellant at 15 n. 15 (describing "razor and razor blade concept"), and IDEXX did not require its distributors to stop selling CDC's consumables, only its machines.

cient to give it a different character." *Id.* at 581, 43 S.Ct. at 213.

*Curtis* remains good law and has been cited in those few cases in which exclusive dealing arrangements that involve no sale to the dealer have been asserted under the Clayton Act. *See C.B.S. Bus. Equip. Corp. v. Underwood Corp.*, 240 F.Supp. 413, 424 (S.D.N.Y.1964) ("If, as the Court finds, the Sales Agreement is an agency contract, and not a contract of sale upon condition, this would appear to dispose of the charge of illegality under Section 3 of the Clayton Act.") (citing *Curtis*); *Preformed Line Prods. Co. v. Fanner Mfg. Co.*, 225 F.Supp. 762, 789 (N.D.Ohio 1960) ("The Condon Company is not a dealer or distributor. It does not buy and re-sell plaintiff's products. Its relationship to plaintiff is that of sales representative. The selection of an exclusive representative is not within the ban of the antitrust laws ...") (citing *Curtis*), *aff'd*, 328 F.2d 265 (6th Cir.1964); *see also Grand Union Co. v. FTC*, 300 F.2d 92, 97 n. 14 (2d Cir.1962) ("In *Curtis,* the agency agreement created a set of relationships and responsibilities unlike that which would have resulted from contracts of sale. Under the antitrust laws the difference between a 'sale' and an agency relationship is not simply one of form, but may be 'outcome-determinative.'") (dicta); 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1800d, at 21 (1998).

Since we dispose of CDC's Clayton Act claim on this threshold ground, we need not reach the question, decided by the district court, of whether the arrangements have anti-competitive effects of the kind and to the degree proscribed by the Clayton Act.

## B. Sherman Act Claims

The conclusion that a contract does not violate § 3 of the Clayton Act ordinarily implies the conclusion that the contract does not violate the Sherman Act:

> We need not discuss the respondents' further contention that the contract also violates § 1 and § 2 of the Sherman Act,

for if it does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the former.

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 335, 81 S.Ct. 623, 632, 5 L.Ed.2d 580 (1961) (citing *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 608–609, 73 S.Ct. 872, 880, 97 L.Ed. 1277 (1953)). The Supreme Court's reference in *Tampa Electric* to the "broader proscription" of the Clayton Act, read in context, references the requisite degree of market foreclosure. *See id.; see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1304 n. 9 (9th Cir.1982) ("[A] greater showing of anti-competitive effect is required to establish a Sherman Act violation than a section 3 Clayton Act violation in exclusive-dealing cases." (citation omitted)). The ordinary rule does not decide the Sherman Act claims in this case, however, because CDC's Clayton Act claim fails for lack of sale or contract of sale, and there seems to be no such requirement in the relevant portions of the Sherman Act. *See* 11 Hovenkamp ¶ 1800d, at 21 ("Most courts interpreting the Sherman Act conclude that whether the underlying distribution arrangement is one of sale/resale or of agency has nothing to do with the legality of exclusive dealing.").

### 1. Sherman Act § 1

Section 1 of the Sherman Act proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. A handful of practices that are deemed particularly anti-competitive are adjudged illegal "per se." Section 1 claims involving economic practices other than those in the narrow "per se" category are subjected to the "rule of reason." *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 457–58, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986); *Bogan v. Hodgkins*, 166 F.3d 509, 513–14 (2d Cir.1999).

a. *"Per Se" Violation.* CDC alleges that IDEXX and the distributors agreed that the distributors would stop selling CDC's machine and that such concerted action was a "per se" illegal "refusal to deal."

 CDC's argument is meritless. We have said that "exclusive distributorship arrangements are presumptively legal." *Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.,* 129 F.3d 240, 245 (2d Cir.1997). CDC offers no persuasive reason why the exclusive distributorship arrangements in this case should be deemed illegal per se. We will therefore examine the arrangements under the "rule of reason." *See Bogan,* 166 F.3d at 514 ("Only 'manifestly anticompetitive' conduct ... is appropriately designed *per se* illegal. The majority of allegedly anticompetitive conduct continues to be examined under the rule of reason." (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (internal citation omitted))); *see also Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 735–36, 108 S.Ct. 1515, 1525, 99 L.Ed.2d 808 (1988) ("[E]conomic analysis supports the view, and no precedent opposes it, that a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels.").

 b. *Rule of Reason.* Under the rule of reason, " 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited.' " *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 127 (2d Cir.1995) (quoting *Continental T.V.,* 433 U.S. at 49, 97 S.Ct. at 2557). As an initial matter, the plaintiff must demonstrate that the practice it challenges has had "an *actual* adverse effect on competition as a whole in the relevant market." *Id.* at 127 (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 543 (2d Cir.1993)) (internal quotation marks omitted).[4]

 CDC has failed to make that initial showing:

- CDC has not shown that there are significant barriers to entry into this market. *See CDC Technologies,* 7 F.Supp.2d at 129.

- CDC's effort to cast its claim as one involving "outlet foreclosure" is defeated by the fact that the distributors, which do not buy or sell the machines, are not outlets. We agree with the Ninth Circuit's conclusion that "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements with distributors] foreclose from competition *any* part of the relevant market." *Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1163 (9th Cir.1997), *cert. denied,* ── U.S. ──, 119 S.Ct. 46, 142 L.Ed.2d 36 (1998); *see also Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1383–84 (5th Cir.1994); *Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1234–35 (8th Cir.1987).

- The distributors have never been critical to CDC's sales strategy. CDC has successfully reached customers by a variety of marketing techniques; after losing its existing distributors to IDEXX, CDC delayed serious pursuit of other available distributors; it eventually achieved distributor coverage almost nationwide

---

4. Assuming the plaintiff succeeds in making this showing, the defendant must establish the "pro-competitive redeeming virtues" of the practice. *See K.M.B. Warehouse,* 61 F.3d at 127 (internal quotation marks omitted). If the defendant is successful, the plaintiff must then demonstrate "that the same pro-competitive effect could be achieved through an alternative means that is less restrictive of competition." *Id.* Because we conclude that CDC fails to establish a genuine issue of material fact on its initial showing, we do not reach the second and third steps of the analysis.

despite the IDEXX exclusive dealing arrangements; indeed, CDC's sales increased after IDEXX entered the market. *See CDC Technologies,* 7 F.Supp.2d at 128–29.

- Also highly significant is that the IDEXX exclusive dealing contracts were easily terminable on short notice; any distributor that preferred to promote CDC's machine could switch allegiance with ease.[5] *See id.* at 129; *see also Balaklaw v. Lovell,* 14 F.3d 793, 799 (2d Cir.1994) (noting that exclusive dealing arrangements with reasonable termination provisions "may actually encourage, rather than discourage competition"); *Omega Envtl.,* 127 F.3d at 1163–64; 11 Hovenkamp ¶ 1802g, at 85.

In short, "there is scant evidence that IDEXX's exclusive dealing contract at the distributor level impeded CDC's ability to reach the ultimate customers of its hematology analyzer." *CDC Technologies,* 7 F.Supp.2d at 128.

■ A plaintiff that fails to demonstrate adverse effects on competition may nevertheless satisfy its preliminary burden by establishing that the defendant "possess[es] the requisite market power and thus the capacity to inhibit competition market-wide." *K.M.B. Warehouse,* 61 F.3d at 129 (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 546 (2d Cir.1993)) (internal quotation marks omitted). "Market power" is " 'the ability to raise price significantly above the competitive level without losing all of one's business.' " *Id.* (quoting

*Graphic Prods. Distribs. v. Itek Corp.,* 717 F.2d 1560, 1570 (11th Cir.1983)).

■ CDC offers no direct evidence of market power. Instead, it invokes the rule that "market share may be used as a proxy for market power." *K.M.B. Warehouse,* 61 F.3d at 129. However, even assuming that CDC's market share evidence were sufficient to create a triable issue as to market power, CDC's claim could not withstand summary judgment. "[A] showing of market power, while necessary to show adverse effect indirectly, is not sufficient. There must be other grounds to believe that the defendant's behavior will harm competition market-wide...." *K.M.B. Warehouse,* 61 F.3d at 129; *see also Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 97 (2d Cir.1998); *Clorox Co. v. Sterling Winthrop, Inc.,* 117 F.3d 50, 59 (2d Cir.1997). For the reasons discussed above, CDC has failed to create a genuine issue of material fact on its claim that the exclusive dealing agreements "harm competition market-wide." *K.M.B. Warehouse,* 61 F.3d at 129.

### 2. *Sherman Act § 2*

We affirm the dismissal of CDC's claims under § 2 of the Sherman Act for substantially the reasons stated by Magistrate Judge Garfinkel. *See CDC Technologies,* 7 F.Supp.2d at 130–31.[6]

### C. *State Law Claims*

We affirm the dismissal of CDC's state claims for substantially the reasons stated by the magistrate judge and Judge Arter-

---

**5.** CDC claims that distributors considering a switch to CDC would be intimidated by fear that IDEXX would cut them off from other IDEXX products (e.g., not just hematology analyzers). The magistrate judge concluded that CDC adduced no admissible evidence on this point, *see CDC Technologies,* 7 F.Supp.2d at 129, a conclusion that CDC does not challenge on appeal.

**6.** The magistrate judge initially noted that CDC's § 2 claim fails a fortiori because CDC

could not establish the less demanding Clayton Act cause of action. *See id.* at 130 (citing *Tampa Elec.,* 365 U.S. at 335, 81 S.Ct. at 632). As noted previously, we do not rely on that rule. Notwithstanding the invocation of the *Tampa Electric* short-cut, however, the magistrate judge went on to provide independent analysis of the § 2 claims. *See id.* at 130–31. It is on that portion of the opinion that we affirm.

ton. *See id.* at 122, 125 n. 5, 130 n. 10, 131–32.

## CONCLUSION

For these reasons, the judgment of the district court is affirmed.