[969 NE2d 187, 946 NYS2d 71]

GLOBAL REINSURANCE CORPORATION-U.S. BRANCH, Formerly Known as GERLING GLOBAL REINSURANCE CORPORATION-U.S. BRANCH, Respondent, v EQUITAS LTD. et al., Appellants.

Argued February 15, 2012; decided March 27, 2012

**POINTS OF COUNSEL**

*Simpson Thacher & Bartlett LLP*, New York City (*Kevin J. Arquit, Mary Kay Vyskocil* and *Summer Craig* of counsel), and *Simpson Thacher & Bartlett LLP*, Washington, D.C. (*Arman Y.*

*Oruc* of counsel), for appellants. I. Equitas Ltd.'s, Equitas Reinsurance Ltd.'s, and Equitas Policyholders Trustee Ltd.'s unilateral claims handling conduct cannot be challenged as an antitrust conspiracy without challenging its formation. (*Texaco Inc. v Dagher*, 547 US 1; *Anheuser-Busch, Inc. v Abrams*, 71 NY2d 327; *Copperweld Corp. v Independence Tube Corp.*, 467 US 752; *United States v Sealy, Inc.*, 388 US 350; *United States v Topco Associates, Inc.*, 405 US 596; *Arizona v Maricopa County Medical Soc.*, 457 US 332; *Rothery Stor. & Van Co. v Atlas Van Lines, Inc.*, 792 F2d 210; *USX Corp. v Adriatic Ins. Co.*, 64 F Supp 2d 469.) II. Global Reinsurance Corporation-U.S. Branch improperly challenges the formation of Equitas Ltd., Equitas Reinsurance Ltd. and Equitas Policyholders Trustee Ltd. under the Donnelly Act. (*Padula v Lilarn Props. Corp.*, 84 NY2d 519; *Goshen v Mutual Life Ins. Co. of N.Y.*, 286 AD2d 229; *Board of Trustees of Univ. of Ill. v United States*, 289 US 48; *South-Central Timber Development, Inc. v Wunnicke*, 467 US 82; *Michelin Tire Corp. v Wages*, 423 US 276.) III. The complaint should be dismissed as time-barred. (*Zenith Radio Corp. v Hazeltine Research, Inc.*, 401 US 321; *In re Buspirone Patent Litig.*, 185 F Supp 2d 363; *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F Supp 2d 188; *Varner v Peterson Farms*, 371 F3d 1011; *Grand Rapids Plastics, Inc. v Lakian*, 188 F3d 401.) IV. Global Reinsurance Corporation-U.S. Branch fails to allege a submarket or restraint of trade in a worldwide market. (*Creative Trading Co. v Larkin-Pluznick-Larkin, Inc.*, 136 AD2d 461; *Capital Imaging Assoc., P.C. v Mohawk Val. Med. Assoc., Inc.*, 996 F2d 537; *CDC Tech., Inc. v IDEXX Labs., Inc.*, 186 F3d 74; *Brown Shoe Co. v United States*, 370 US 294; *Geneva Pharms. Tech. Corp. v Barr Labs. Inc.*, 386 F3d 485; *Newcal Indus., Inc. v Ikon Off. Solution*, 513 F3d 1038.) V. The Appellate Division erred in finding subject matter jurisdiction over Equitas Ltd.'s, Equitas Reinsurance Ltd.'s, and Equitas Policyholders Trustee Ltd.'s conduct. (*South-Central Timber Development, Inc. v Wunnicke*, 467 US 82; *F. Hoffmann-La Roche Ltd v Empagran S. A.*, 542 US 155; *Boyd v AWB Ltd.*, 544 F Supp 2d 236; *Animal Science Prods., Inc. v China Natl. Metals & Mins. Import & Export Corp.*, 596 F Supp 2d 842; *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F Supp 2d 555; *Matter of Zurich Ins. Co. v New York State Tax Commn.*, 144 AD2d 202; *Matter of 67 Vestry Tenants Assn. v Raab*, 172 Misc 2d 214.)

*Cahill Gordon & Reindel LLP*, New York City (*Edward P. Krugman, S. Penny Windle* and *Lawrence A. Reicher* of counsel), for respondent. I. Equitas Ltd.'s, Equitas Reinsurance Ltd.'s,

and Equitas Policyholders Trustee Ltd.'s conduct is not unilateral but is the concerted action of the underwriting members of Lloyd's, London through their common agent. (*Texaco Inc. v Dagher*, 547 US 1; *United States v Masonite Corp.*, 316 US 265; *New York ex rel. Spitzer v Saint Francis Hosp.*, 94 F Supp 2d 399; *North Tex. Specialty Physicians v Federal Trade Commn.*, 528 F3d 346; *North Jackson Pharm., Inc. v Express Scripts Inc.*, 345 F Supp 2d 1279; *Life Partners, Inc. v Morrison*, 484 F3d 284; *Nestor v Britt*, 270 AD2d 192; *General Elec. Co. v Inter-America Mktg. Sys.*, 220 AD2d 307; *National Collegiate Athletic Assn. v Board of Regents of Univ. of Okla.*, 468 US 85; *United States v Sealy, Inc.*, 388 US 350.) II. The courts of New York have subject matter jurisdiction over this action. (*California v ARC America Corp.*, 490 US 93; *CSR Ltd. v CIGNA Corp.*, 405 F Supp 2d 526; *CSR Ltd. v Federal Ins. Co.*, 40 F Supp 2d 559; *Pillar Corp. v Enercon Indus. Corp.*, 694 F Supp 1353; *In re Chocolate Confectionary Antitrust Litig.*, 602 F Supp 2d 538; *Allstate Ins. Co. v Hague*, 449 US 302; *Sperry v Crompton Corp.*, 8 NY3d 204; *Matter of Zurich Ins. Co. v New York State Tax Commn.*, 144 AD2d 202; *Matter of People [Norwegian Receiver of Norske Lloyd Ins. Co.]*, 242 NY 148; *Moscow Fire Ins. Co. v Bank of N.Y. & Trust Co.*, 280 NY 286.) III. Global Reinsurance Corporation-U.S. Branch's claim is timely. (*Hanover Shoe, Inc. v United Shoe Machinery Corp.*, 392 US 481; *Klehr v A. O. Smith Corp.*, 521 US 179; *Zenith Radio Corp. v Hazeltine Research, Inc.*, 401 US 321; *In re Nine W. Shoes Antitrust Litig.*, 80 F Supp 2d 181; *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F Supp 2d 188; *Imperial Point Colonnades Condominium, Inc. v Mangurian*, 549 F2d 1029; *Toledo Mack Sales & Serv., Inc. v Mack Trucks, Inc.*, 530 F3d 204; *Champagne Metals v Ken-Mac Metals, Inc.*, 458 F3d 1073; *Poster Exch., Inc. v National Screen Serv. Corp.*, 517 F2d 117; *Varner v Peterson Farms*, 371 F3d 1011.) IV. The Appellate Division correctly upheld the pleading of a rule-of-reason violation. (*Leon v Martinez*, 84 NY2d 83; *Guggenheimer v Ginzburg*, 43 NY2d 268; *Capitaland United Soccer Club v Capital Dist. Sports & Entertainment*, 238 AD2d 777; *Board of Trade of Chicago v United States*, 246 US 231; *People v Rattenni*, 81 NY2d 166; *Arizona v Maricopa County Medical Soc.*, 457 US 332; *State Oil Co. v Khan*, 522 US 3; *United States v Visa U.S.A. Inc.*, 163 F Supp 2d 322; *National Soc. of Professional Engineers v United States*, 435 US 679; *California Dental Assn. v FTC*, 526 US 756.)

*Dewey & LeBoeuf LLP*, New York City (*John M. Nonna, Larry P. Schiffer* and *Daniel T. Stabile* of counsel), for Society of

Lloyd's, amicus curiae. The formation of Equitas Ltd., Equitas Reinsurance Ltd. and Equitas Policyholders Trustee Ltd. was procompetitive.

## OPINION OF THE COURT

Chief Judge LIPPMAN.

At issue is the sufficiency and extraterritorial reach of plaintiff's claim under New York State's antitrust statute, commonly known as the Donnelly Act (General Business Law § 340 *et seq.*).

Plaintiff is a New York branch of a German reinsurance corporation. Defendants (hereinafter collectively referred to as Equitas) are London, England based entities engaged in the business of providing retrocessionary reinsurance. Retrocessionary reinsurers, or retrocessionaires as they are known, write coverage for risks ceded to them by reinsurers, in this transactional context referred to as "cedents."

According to the complaint, this action arises from practices employed in connection with the handling of claims made under retrocessional reinsurance treaties providing what is known as "non-life" coverage. Among the risks insured under this heading are those of environmental, catastrophic and asbestos related origin. Liabilities under policies insuring such risks typically are of the "long tail" variety; they may surface long after the policy period and it is clear in retrospect that underwriters did not accurately appreciate the magnitude of "non-life" risks or the unusual persistence of the liability they would engender.

Over the years, Lloyd's of London, an insurance marketplace composed of numerous competing insurance syndicates, themselves composed of individual underwriting participants (natural persons referred to as Names), issued, through its syndicates substantial non-life retrocessional coverage. By the early 1990s, it became evident that the liabilities arising under this coverage were mounting at an alarming rate and would soon outstrip the syndicates' reserves.

The syndicates individually proved unable to respond to this impending crisis, in significant part because in competing with each other for prospective business it was their practice to pay retrocessionary claims without haggling and without imposing onerous administrative burdens on their cedents. It was thus proposed that, since individual action by the syndicates to limit

liability by more closely scrutinizing claims would be commercially unviable, the Names should agree to repose decision making with respect to the handling of certain liabilities arising under pre-1993 Lloyd's non-life retrocessionary coverage, in a newly created entity—a reinsurer that would, because it would be in perpetual "run-off" (i.e., merely concluding obligations under existing coverage and not soliciting new business), be free to adopt a more aggressive approach to the handling of claims. This proposal, as set forth by the governing body of Lloyd's in a "Reconstruction and Renewal Plan" (R&R plan), was approved by the Names and subsequently reviewed and found unobjectionable by United Kingdom and European Union antitrust regulatory authorities, i.e., the United Kingdom Department of Trade and Industry and the European Commission.[1]

It was pursuant to the R&R plan that Equitas was created in 1996 to reinsure the otherwise uninsurable non-life retrocessionary obligations of the Lloyd's syndicates. And, in accordance with a Reinsurance and Runoff Contract (RROC), the Names reinsured with Equitas their risks under the Lloyd's syndicates' pre-1993 non-life retrocessionary treaties. The consideration for this coverage was comprised of some £14.7 billion in assets (premiums paid for the subject coverage) held by the syndicates and significant additional contributions by the Names individually, and by Lloyd's and its functionaries. Although subsequent to these transfers and until 2009[2] the Names remained severally liable under the coverage extended by the syndicates, pursuant to the RROC Equitas was given plenary power to manage claims arising under the subject pre-1993 coverage.[3] The Names were concomitantly barred from reaching the funds transferred in exchange for the reinsurance provided by Equitas.

Plaintiff reinsurer purchased coverage for some of its non-life risks from Lloyd's retrocessionaires. The risks ceded by it to

---

1. The R&R plan was also submitted for comment to various US government agencies, among them the New York State Department of Insurance, which registered no objection.

2. In 2009, Equitas, with the approval of the British High Court undertook finally to relieve the Names of their obligations under the retrocessional treaties at issue (*see Matter of Names at Lloyd's for the 1992 & Prior Years of Account, Represented by Equitas Ltd.*, [2009] EWHC 1595 [Ch], 2009 WL 1949482 [July 7, 2009]).

3. Under section 9.2 (a) of the RROC, Equitas was authorized "to adjust, handle, agree, settle, pay, compromise or repudiate any Claim, return premium, reinsurance premium or any other insurance or reinsurance liability on behalf of the Syndicate or Closed Year Syndicate."

Lloyd's syndicates underwritten by pre-1993 retrocessionary coverage were, subsequent to the adoption of the R&R plan, in turn ceded by the Lloyd's retrocessionaires to Equitas under the RROC. According to plaintiff, Equitas adopted a "hard-nosed" approach to the handling of its claims, involving among other practices, holding payments due hostage to concessions by plaintiff and imposing extraordinarily onerous documentation requirements. In addition to commencing arbitration proceedings against the underwriters in which it sought damages for these alleged abuses under the governing insurance treaties, plaintiff filed this action in March 2007, asserting in its original complaint a Donnelly Act claim as well as one sounding in tortious interference with contractual relations.

On a CPLR 3211 motion preceding the one now before us, the tortious interference claim was dismissed, upon the ground then urged by Equitas that the wrongful conduct attributed by plaintiff to it had not been performed by it as a stranger to the contracts said to have been interfered with, but in its capacity as the claims handling agent of the contractually bound Names (20 Misc 3d 1115[A], 2008 NY Slip Op 51362[U], *8 [2008]). The motion court, however, sustained plaintiff's Donnelly Act claim finding, as is here relevant, that plaintiff had adequately alleged in the claim's support a geographical market for retrocessional non-life insurance limited to the Lloyd's marketplace. The court nonetheless granted plaintiff's request to amend its complaint to allege that the relevant market was global.[4]

The resulting second amended complaint, the pleading now at issue, alleges in support of the Donnelly Act claim that prior to the R&R plan and the consequent creation of Equitas, retrocessional non-life claims handling with respect to pre-1993 Lloyd's coverage was performed by the individual Lloyd's syndicates which, because they competed with each other for new business and were thus anxious to curry favor with potential cedents, were disposed to settle claims expeditiously and fairly. Following the R&R plan and the centralizing of all decision making respecting the handling of the subject category of claims in Equitas pursuant to the RROC, there ceased to be any competitive

---

4. This amendment, as the parties then understood, would be essential to the action's survival, since there was no factually plausible contention that the Lloyd's marketplace was the relevant market in assessing whether Equitas's claims handling practices had an anticompetitive effect upon the retrocessional non-life insurance market.

disincentive to the adoption of sharp claims management prac-
tices—Equitas had no interest in attracting prospective busi-
ness; its sole mission was to marshal its fund with the consider-
able amount of parsimony necessary to cover the avalanche of
liabilities that had led to its existence. The complaint further al-
leged that Lloyd's concentration of claims management decision
making power in Equitas would operate to suppress competition
in the delivery of a crucial component of the retrocessional non-
life coverage product, namely, claims management, and that it
would do so not only within the Lloyd's marketplace, but in the
world.[5]

After the filing of the second amended complaint, Equitas
again moved to dismiss pursuant to CPLR 3211. In deciding
this motion, Supreme Court focused upon the circumstance that
the complaint, while nominally alleging that the pertinent
geographical market for the particular species of coverage at is-
sue was global, actually seemed to continue to rely upon the ex-
istence of a cognizable submarket confined to the Lloyd's
marketplace. Given the new allegations that there was a
worldwide market for retrocessional non-life coverage, and the
absence of any allegation that the coverage available in the
Lloyd's marketplace could not be acquired elsewhere on com-
petitive terms, the court concluded that Lloyd's was not a viable

---

5. The relevant allegations are contained in paragraph 36 of the complaint:
"36. In 1993, in 1996, at the time this action was commenced,
and currently, the Lloyd's syndicates collectively had market
power in the worldwide market for retrocessional coverage.
"(a) In 1993, in 1996, at the time this action was commenced,
and currently, the Lloyd's marketplace was the single most sig-
nificant seller of most forms of non-life retrocessional coverage to
reinsurers worldwide.
"(b) In 1993, in 1996, at the time this action was commenced,
and currently, the Lloyd's marketplace provides the benchmark
for prices, terms, and conditions for most forms of non-life
retrocessional coverage.
"(c) In 1993, in 1996, at the time this action was commenced,
and currently, any reinsurer, and any reinsurance broker, wish-
ing to purchase retrocessional coverage would have to at least
consider approaching Lloyd's for quotes and would have to take
into account the terms and conditions offered by various Lloyd's
syndicates in determining what to purchase, and on what terms.
"(d) For many lines of retrocessional business, and in many years,
competition *within* the Lloyd's marketplace is more significant to
prospective purchasers of retrocessional coverage than is compe-
tition between Lloyd's as a whole and other sellers, because
Lloyd's is expected to, and does, set the lead in establishing cover-
age."

submarket and on that ground dismissed the Donnelly Act claim, since an assertion of market power adequate to sustain a claim for restraint of trade may only be demonstrated within the context of an identified relevant market or submarket (24 Misc 3d 264, 273-274 [Sup Ct, NY County 2009]).[6]

On plaintiff's appeal from the subsequently entered judgment dismissing the complaint,[7] the Appellate Division, with one justice dissenting, reversed and reinstated the Donnelly Act claim. The Court found that the complaint adequately pleaded a worldwide market. And, while acknowledging that the crucial allegations contained in paragraph 36 of the amended pleading (n 5, *supra*), did not separately allege market power—i.e., that Lloyd's was capable of unilaterally raising prices for retrocessional non-life coverage in the relevant market significantly without losing any business (*see CDC Tech., Inc. v IDEXX Labs., Inc.*, 186 F3d 74, 81 [2d Cir 1999])—the allegations read together and liberally construed were, in the Court's view, adequate to that purpose (82 AD3d 26, 35 [1st Dept 2011]). The Court rejected, either expressly or impliedly, defendants' remaining contentions, among them that there was no actionable conspiracy because Equitas had at all relevant times acted unilaterally and pursuant to agreements (the R&R plan and the RROC) approved by the United Kingdom and European regulatory authorities; and that, even if a London-based conspiracy to restrain trade was adequately alleged, it could not be reached under a New York State antitrust statute presumptively without extraterritorial effect.

The Appellate Division granted Equitas leave to appeal, certifying to this Court the question of whether its order reversing the order of Supreme Court was properly made. We now reverse.

---

**6.** Although there are Appellate Division decisions recognizing this basic requirement of a Donnelly Act claim (*see e.g. Creative Trading Co. v Larkin-Pluznick-Larkin, Inc.*, 136 AD2d 461, 462 [1st Dept 1988]), there do not appear to be any cases from our Court. It does not seem, however, that there would be much room for doubt as to the requirement. It is logically necessary to a coherent allegation of a trade restraint and has been recognized by federal courts in assessing the adequacy of pleadings alleging violations under the Sherman Act (15 USC § 1 *et seq.*; *see e.g. Newcal Indus., Inc. v Ikon Off. Solution*, 513 F3d 1038, 1045 [9th Cir 2008], *cert denied* 557 US —, 129 S Ct 2788 [2009]), after which the Donnelly Act is modeled (*see State of New York v Mobil Oil Corp.*, 38 NY2d 460, 463 [1976]).

**7.** The Donnelly Act claim and the pendent claim for injunctive relief were all that remained of the complaint following the motion court's earlier dismissal of plaintiff's tortious interference claim.

An antitrust claim under the Donnelly Act, or under its essentially similar federal progenitor, section 1 of the Sherman Act (15 USC § 1 *et seq.*; *see Anheuser-Busch, Inc. v Abrams*, 71 NY2d 327, 335 [1988]; *Mobil Oil Corp.*, 38 NY2d at 463), must allege both concerted action by two or more entities and a consequent restraint of trade within an identified relevant product market (*see e.g. Home Town Muffler v Cole Muffler*, 202 AD2d 764, 765 [3d Dept 1994]; *Creative Trading*, 136 AD2d at 462; *Capital Imaging Assoc., P.C. v Mohawk Val. Med. Assoc., Inc.*, 996 F2d 537, 542-543 [2d Cir 1993], *cert denied* 510 US 947 [1993]). Equitas argues that the second amended complaint fails sufficiently to allege either element.

For present purposes, we assume, without deciding, that a conspiracy is alleged. In favor of that assumption we note that, although the complaint contains allegations that Equitas acted independently of the syndicates in discharging its claims management function and was a legally and financially autonomous entity, it also alleges in substance that the collective assumption of the claims management function previously performed by the syndicates individually was Equitas's raison d'être under the RROC and that Equitas from its inception and at all relevant subsequent times acted, if not as an agent in the traditional sense, at least as a preprogrammed instrumentality of the Names. Indeed, it will be recalled that in obtaining the dismissal of plaintiff's tortious interference claim Equitas itself represented that it was the claims agent of the Names, and, according to the complaint the allegations of which we must at this juncture accept as true, Equitas had no other purpose but that of fixing and capping the Names' liability under the subject pre-1993 coverage. Although there are situations in which a fully integrated entity that takes over and consolidates economic functions formerly performed competitively will be deemed sufficiently autonomous in its subsequent operations to preclude their characterization as conspiratorial within the meaning of the antitrust laws (*see e.g. Texaco Inc. v Dagher*, 547 US 1 [2006]), the pertinent inquiry in determining whether there is concerted or unilateral activity is one of substance and not form (*American Needle, Inc. v National Football League*, 560 US —, —, 130 S Ct 2201, 2211-2212 [2010]); what is important is how the parties to the alleged anticompetitive conduct actually operate (560 US at —, 130 S Ct at 2209). Here, there is discernible from the pleading a perhaps colorable claim that Equitas was engaged in concerted activity when it exercised

in place of and on behalf of the coexisting Lloyd's syndicates consolidated decision making authority over the management of the syndicates' pre-1993 retrocessional non-life liabilities.

■ The substantive problem with this action is rather that although a worldwide market is nominally alleged, as is evidently essential since it is clear that the retrocessional non-life product is available globally and that there is no distinct legally cognizable submarket,[8] there is no allegation of any anti-competitive effect attributable to the posited conspiracy beyond the Lloyd's marketplace.

Ordinarily, a Donnelly or Sherman Act plaintiff, to survive a motion to dismiss in a rule of reason case, such as this one,[9] must minimally allege that conspirators possessed power within the relevant market to produce a market-wide anticompetitive effect (*see Capital Imaging*, 996 F2d at 546). Defined in the context of sales, market power is the ability to raise prices significantly without losing business (*see CDC Tech.*, 186 F3d at 81), but more generally may be understood as the capacity to impose onerous economic terms without suffering competitive detriment. Here, there is no allegation of any such power in the relevant worldwide market. While the Lloyd's syndicates were capable of insulating themselves from each other's competitive behavior in the area of claims management and could by that device attempt to cap their liabilities under certain previously issued coverage, there are no allegations from which it is possible to gather that they were capable of avoiding the business consequences of this approach in the global market.

---

**8.** Although, as noted (*see* supra at 729), the second amended complaint, while alleging a worldwide product market, retained its claim of a distinct submarket confined to Lloyd's, the latter is not a legally viable allegation. Product markets are defined for antitrust purposes by applying the rule of "reasonable interchangeability" (*see Todd v Exxon Corp.*, 275 F3d 191, 201 [2d Cir 2001]) and, particularly in light of the second amended complaint's allegation that the relevant market is global, i.e., that the subject Lloyd's product is interchangeable with retrocessional reinsurance products available worldwide, there is no plausible explanation for the persisting submarket allegation (*see id.* at 200). Global, accordingly, appears to have abandoned its submarket claim.

**9.** There is no contention in this case of a per se violation; whether any restraint on trade for which defendants are shown to have been responsible was unreasonable is a bona fide issue in this litigation. There is no dispute that the purported conspiracy arose as a response to the impending ruin of the Lloyd's marketplace, an event that defendants contend would have significantly reduced competition in the world market for retrocessional non-life coverage.

Recognizing that on a CPLR 3211 motion to dismiss the allegations of the complaint must be accepted as true and construed liberally in the plaintiff's favor (*Cron v Hargro Fabrics*, 91 NY2d 362, 366 [1998]), and that in the antitrust context courts are "hesitant" to dismiss complaints on the pleadings based on the sufficiency of product market allegations (*Todd*, 275 F3d at 200), it is nonetheless the case that there is no per se rule barring dismissal where the complaint simply does not allege a conspirator's basic capacity to inflict market-wide anticompetitive injury (*see id.*). Here, there is no dispute as to the relevant market and, accordingly, no need for factual development on that point. The pertinent analytic focus is instead upon whether the complaint alleges the requisite power within the relevant worldwide market on the part of the claimed conspirators. We cannot conclude that it does.

The allegations in paragraph 36 of the complaint do not singly or in combination allege market power as that term of art is defined in the antitrust lexicon. Lloyd's may, as plaintiff alleges, be the single most significant vendor of retrocessional non-life coverage; it may set the benchmark for the terms of such coverage and its quotes may be viewed as essential by reinsurers and reinsurance brokers; there may in addition be lines of retrocessional coverage with respect to which price competition with Lloyd's is considered more significant than competition in the world market. None of this, however, would justify the inference that Lloyd's could at will generally engage in "run-off" type claims management behavior and retain its business in a global market. Plaintiff was perhaps injured by an anticompetitive restraint in the Lloyd's market, but that is not a circumstance from which it is possible to conclude that there was some broader anticompetitive effect, or even a capacity to produce such an effect, in the relevant world market. It is market-wide effect that is crucial to an antitrust claim under the Sherman Act or Donnelly Act (*see CDC Tech.*, 186 F3d at 80-81), not the existence of otherwise compensable individual injury. Plaintiff is evidently pursuing contract claims against Lloyd's underwriters in arbitration based on the same claims handling practices presently alleged. The question here is whether plaintiff may, premised on such allegations of localized individual harm, seek an award of treble damages for an antitrust violation. Inasmuch as it is the market-wide nature of the harm that would justify any such award, the answer, we believe, must be no.

■ Even if this pleading deficiency could be cured—and we perceive no reason to suppose that the formidable hurdle of

alleging market power could be surmounted by plaintiff—there would remain as an immovable obstacle to the action's maintenance, the circumstance that the Donnelly Act cannot be understood to extend to the foreign conspiracy plaintiff purports to describe.

The complaint alleges, essentially, that a German reinsurer through its New York branch purchased retrocessional coverage in a London marketplace and consequently sustained economic injury when retrocessional claims management services were by agreement within that London marketplace consolidated so as to eliminate competition over their delivery. Injury so inflicted, attributable primarily to foreign, government approved transactions having no particular New York orientation and occasioning injury here only by reason of the circumstance that plaintiff's purchasing branch happens to be situated here, is not redressable under New York State's antitrust statute. That this is so is demonstrable when the Donnelly Act is considered in the context of federal antitrust law.

Assuming that the extraterritorial reach of the Donnelly Act is as extensive as that of its federal counterpart, the Sherman Act—an assumption that we do not ultimately embrace—it seems fairly clear that the Sherman Act would not reach a competitive restraint, imposed by participants in a British marketplace, that only incidently affected commerce in this country.

The Sherman Act's extraterritorial reach is limited under the Foreign Trade Antitrust Improvements Act (FTAIA) of 1982 (15 USC § 6a), which provides that the Sherman Act "shall not apply to conduct involving [non-import] trade or commerce . . . with foreign nations." The only ground for excepting to this general rule of inapplicability where imports are not involved[10] is where the conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, and "such effect gives rise to a [Sherman Act] claim" (15 USC § 6a [1] [A]; [2]; *F. Hoffmann-La Roche Ltd v Empagran S. A.*, 542 US 155, 162 [2004]). The London conspiracy here alleged was, according to the complaint, worldwide in its orientation; there is nothing in the pleadings to justify an inference that it targeted United States commerce specially or that its effect upon commerce in

---

10. There is no contention that the reinsurance product purchased by plaintiff at the Lloyd's marketplace was an import. Nor are there allegations that the alleged conspiracy was directed at any defined import market in this country (*see Animal Science Prods., Inc. v China Minmetals Corp.*, 654 F3d 462, 471 n 11 [3d Cir 2011]).

this country was substantial. Even if there were, however, the viability of a Sherman Act claim would still finally depend upon whether the domestic effect of the foreign conspiracy would itself "give rise" to a claim under the Sherman Act (*id.*). Plaintiff, although alleging individual injury in New York, has not alleged harm to competition in this country (*see E & L Consulting, Ltd. v Doman Indus. Ltd.*, 472 F3d 23, 28 n 3 [2d Cir 2006], *cert denied* 552 US 816 [2007] ["It should go without saying . . . that a party cannot establish antitrust injury without establishing a violation of the antitrust laws, which, under Section 1 (of the Sherman Act), must involve an injury to competition"]). The only harm to competition alleged is within a particular London reinsurance marketplace. It seems clear that even if plaintiff had an otherwise viable Sherman Act claim based on harm to competition in the relevant global market, which it does not, it still would not, premised on its allegations of domestic harm, have a jurisdictional predicate for that claim. It is not necessary to know precisely the extent of the Donnelly Act's extraterritorial reach to understand that it cannot reach foreign conduct deliberately placed by Congress beyond the Sherman Act's jurisdiction. The federal limitation upon the reach of the Sherman Act, predicated upon and an expression of the essentially federal power to regulate foreign commerce, would be undone if states remained free to authorize "little Sherman Act" claims that went beyond it. The established presumption is, of course, against the extraterritorial operation of New York law (*see* McKinney's Consolidated Laws of NY, Book 1, Statutes § 149), and we do not see how it could be overcome in a situation where the analogue federal claim would be barred by congressional enactment.

It is not an answer to this analysis to observe, as plaintiff does, that under the McCarran-Ferguson Act (15 USC § 1011 *et seq.*) regulation of the "business of insurance" is committed to the states (15 USC § 1012 [b]). What is at issue here is not in the main the regulation of the "business of insurance," a matter within the special competence and jurisdictional reach of domestic state regulators, but the address of a purported foreign conspiracy to restrain trade, a matter to be dealt with, if at all, under the significantly distinct antitrust rubric (*see Group Life & Health Ins. Co. v Royal Drug Co.*, 440 US 205, 210-211 [1979]). The question now before us—as to the extraterritorial reach of our state antitrust law—is, then, not one as to which the McCarran-Ferguson Act commitment is relevant. What is

instead highly relevant is that the Donnelly Act's reach must be understood as part of a jurisdictional continuum whose outermost extension is defined by federal antitrust law. While it is true that the scope of federal subject matter jurisdiction under the Sherman Act, as limited by the FTAIA and federal decisions following *Empagran* (542 US 155 [2004], *supra*) is frequently far from obvious, we think it sufficiently evident that the Sherman Act would not reach the purely foreign conspiracy here claimed, the anticompetitive effect of which beyond the Lloyd's marketplace is not made out.

Nonetheless, we do not ultimately ground our determination that the Donnelly Act does not reach the presently claimed conspiracy upon the FTAIA. Even if the Sherman Act could reach the purported conspiracy, it would not follow that the Donnelly Act should be viewed as coextensive. For a Donnelly Act claim to reach a purely extraterritorial conspiracy, there would, we think, have to be a very close nexus between the conspiracy and injury to competition in this state. That additional element is not discernible from the pleadings before us. It would be a very great, and we think unwarranted, supposition that the authors of the Donnelly Act intended to allow, on a predicate such as the one here alleged, the sort of highly intrusive international projection of state regulatory power now proposed.

Having said this, it should be emphasized that our decision should not be understood as placing some new limitation on the reach of the Donnelly Act. This is simply a rare instance in which a state antitrust action has tested the outer jurisdictional limits not only of state but federal antitrust law.

Accordingly, the order of the Appellate Division should be reversed, with costs, the judgment of Supreme Court reinstated and the certified question answered in the negative.

SMITH, J. (concurring). I agree with the result reached by the majority, and with most of the reasoning in the majority opinion. My only reservation is about the majority's analysis (which, as it acknowledges, is not essential to its decision) of whether the allegations in the complaint would state a claim under the federal antitrust laws. The implications of the Foreign Trade Antitrust Improvements Act of 1982 (15 USC § 6a) for this case (and for many other cases) are, to me at least, far less than clear. I would prefer to express no opinion about them, and simply to rely on the state law grounds explained at page 736 of the majority opinion (and on the similar reasoning contained in

the Appellate Division dissent [82 AD3d 26, 40-41 (2011)]), which sufficiently support the conclusion that the extraterritorial reach of the Donnelly Act does not extend to the transactions at issue here.

Judges CIPARICK, GRAFFEO, READ and JONES concur with Chief Judge LIPPMAN; Judge SMITH concurs in a separate opinion, except insofar as Chief Judge LIPPMAN's opinion discusses whether the allegations of the complaint would state a claim under the federal antitrust laws, in which Judge PIGOTT concurs.

Order reversed, etc.